## THE OYSTER POLICE STEAMERS OF MARYLAND.

UNITED STATES *v.* THE GOVERNOR ROBERT McLANE. SAME *v.* THE GOVERNOR HAMILTON. SAME *v.* THE GOVERNOR P. F. THOMAS.

*(District Court, D. Maryland. May 6, 1887.)*

SHIPS AND SHIPPING—INSPECTION AND REGULATION OF STEAM-VESSELS.
   *He'd,* that the steam-vessels belonging to the state of Maryland, and used by its officers in the enforcement of the state fishery laws, in the Chesapeake bay, to protect the state oyster-beds and fishing rights, and to give relief to vessels in distress, are required by sections 4417 and 4418 to have their boilers and hulls inspected by the United States steam-boat inspectors, and are liable to the penalties prescribed by section 4499 for non-compliance with the pro-visions of the United States law regulating steam-vessels.

*(Syllabus by the Court.)*

In Admiralty.

*Thomas G. Hayes,* U. S. Dist. Atty., and *A. Stirling Pennington,* Asst. U. S. Dist. Atty., for the United States.

*Charles B. Roberts,* Atty. Gen. of Maryland, for respondents.

MORRIS, J. The three steam-vessels above mentioned, having been seized for navigating the Chesapeake bay without complying with the terms of title 52 of the United States Revised Statutes, regulating steam-vessels, these proceedings by way of libel were instituted by the United States to enforce the penalties prescribed by sections 4499 and 4500 of that article. The libels allege that the steam-vessels were found in the years 1885 and 1886 navigating waters of the United States, which are common highways of commerce, and open to general and competitive

navigation, to-wit, the Chesapeake bay and its tributaries, without having their boilers inspected in compliance with section 4418 of the Revised Statutes of the United States; and also without having their hulls inspected in compliance with section 4417. Also that the steamers received on board and transported passengers contrary to section 4424, without having received the certificate of inspection required by section 4421, and required to be exhibited in the manner prescribed by section 4423.

These cases have been heard on an agreed statement of facts, by which it is shown that these several steamers are the exclusive property of the state of Maryland, each being of about 70 tons burden, and carrying officers and crew appointed and paid by the state to the number of about 12 persons for each vessel. The steamers were purchased by the state under an act of the legislature, directing that they should be provided for the use of the state fishery force, and were used during 1885 and 1886 on the Chesapeake bay and its tributaries, in pursuance of the act of the legislature making it the duty of the proper state officers to use them to enforce the state laws passed for the protection of the oyster-beds and fishing rights of the state, and to give relief to vessels in distress. They have continuously, during 1885 and 1886, for that purpose, navigated the Chesapeake bay, and its tributaries, within the territorial limits of the state of Maryland, and not elsewhere; it being agreed, however, that said waters are public waters of the United States, and highways of commerce open to competitive navigation. The said steamers have at times carried other persons than the officers and crews, but at no time has any fare or compensation been received or demanded of any such person. It is also agreed that the state, by its officers, refused to permit the boilers and hulls of these vessels to be inspected by the United States steam-boat inspectors, and that the steamers were not so inspected, and carried no certificate to that effect.

Title 52 of the Revised Statutes of the United States is entitled "Regulation of Steam-Vessels," and by section 4399 it is declared that every vessel, propelled in whole or in part by steam, shall be deemed a steam-vessel within the meaning of the title. By section 4400 it is declared that "all steam-vessels navigating any waters of the United States which are common highways of commerce, or open to general and competitive navigation, excepting public vessels of the United States, vessels of other countries, and boats propelled in whole or in part by steam for navigating canals, shall be subject to the provisions of this title." By section 4426 it is declared that the hull and boilers of every ferry-boat, canal-boat, yacht, or other small craft of like character, propelled by steam, shall be inspected under the provisions of this title. And by the act of seventh August, 1882, it was provided that all foreign private steam-vessels, carrying passengers from the United States to any other country, should be subject to like inspection.

The seizures in these present cases were made under section 4499, which declares that "if any vessel, propelled in whole or in part by steam, be navigated without complying with the terms of this title, the owner

shall be liable to the United States in a penalty of $500 for each offense, one-half for the use of the informer; for which sum the vessel so navigated shall be liable, and may be seized and proceeded against by way of libel in any district court of the United States having jurisdiction of the offense."

The first contention of the learned counsel on behalf of the state is that as in the years 1885 and 1886 a fee of $10 was exacted (Act June 26, 1884) from vessels of 100 tons or under, as compensation for the examinations and inspections made for the year, that the law in effect imposed a tax upon an instrument of state government, and is therefore void, so far as it affects such instruments. It seems obvious from the amount of the fee, and from the express language of the law, that the fee of $10 is solely a compensation for the expense of making the inspection, and that it is a very reasonable charge for that service; so that, if the owner of the boat can lawfully be required to submit her to the inspection, there is no ground to say that the fee is a disguised tax. It is not a tax, and is not in the nature of a tax, so long as it is only a reasonable compensation for a service lawfully rendered. *Packet Co.* v. *St. Louis,* 100 U. S. 423; *Turner* **v.** *Maryland,* 107 U. S. 55, 2 Sup. Ct. Rep. 44.

By the act of congress of June 19, 1886, even this moderate fee has been abolished.

Next, it is contended, on behalf of the state, that as it is conceded that the steamers were never navigated beyond the limits of the state of Maryland, and are not used in commerce of any kind, but are for the use of the state fishery force, to enforce the laws of the state for the protection of its oyster-beds and fisheries, that no law of congress requiring the steamers to be inspected is within any constitutional power given to congress. The supreme court has interpreted the constitution as having by the commercial clause given to congress the exclusive power to regulate navigation upon the public waters of the United States, so that all vessels which navigate those waters, whether engaged in commerce, local or interstate, or for purposes of pleasure simply, may be alike subjected to the regulations which congress prescribes, with those exceptions only which congress deems it wise to make. It may be impossible to regulate navigation upon certain of the public waters and highways of commerce by regulating only a portion of the vessels navigating them. Rules of navigation, to be of effectual avail for the protection and safety of those vessels which are engaged in commerce with foreign nations and among the states, must control also those vessels not engaged in that commerce, which navigate the same waters. It is apparent that the existing legislation of congress, with regard to steam-vessels, proceeds upon the assumption that it possesses full power to regulate all vessels navigating public waters of the United States, whether they are engaged in commerce or not. See *U. S.* v. *Burlington & H. Co. Ferry Co.,* 21 Fed. Rep. 332, and the cases cited in that opinion. And it also is apparent that congress proceeds upon the theory that proper regulation requires that all vessels in those waters shall be subject to one uniform system.

In the case of *The Daniel Ball*, 10 Wall. 564, it is said that the power to regulate commerce "authorizes appropriate legislation for the protection of either interstate or foreign commerce, and for that purpose such legislation as will insure the convenient or safe navigation of all navigable waters of the United States, whether that legislation consists in requiring the removal of obstructions to their use, in prescribing the form and size of vessels employed upon them, or in subjecting the vessels to inspection and license in order to insure their proper construction and equipment." "The power to regulate commerce," the court said in *Gilman* v. *Philadelphia*, 3 Wall. 724, "comprehends the control for that purpose, and to the extent necessary, of all navigable waters of the United States which are accessible from a state other than those in which they lie. For this purpose they are the public property of the nation, and subject to all the requisite legislation of congress."

It is quite obvious that this supreme and exclusive control of the navigable waters might be defeated, or rendered less effective for its objects, if there were to be recognized a class of vessels privileged to use them, without being subject to those provisions which congress determines are required for the safety of all. I am therefore unable to assent to the contention that the fact that the vessels in the present case are not used in commerce, but solely for the police purposes of the fishery force, prevents congress from having the constitutional power to legislate with regard to them. It is not their use, but the fact that they navigate the highways of commerce, which brings them within the constitutional grant of power, and within the language of section 4400 of the act of congress.

Another ground of defense relied upon on behalf of the state is that the steamers are privileged from seizure because they are the public vessels of a sovereign power, and are used solely as instruments of government. The exemption of the public property of one sovereign power from arrest by the courts of another rests upon a general usage of nations, founded upon considerations of public comity and convenience. *The Santissima Trinidad*, 7 Wheat. 353. It may be withdrawn or bargained away.

By the federal compact, in matters relating to vessels navigating the public waters of the nation, the states have agreed that the federal authority shall have supreme and exclusive control; and this implies, of necessity, that no considerations of comity shall prevent the federal courts from enforcing laws which the federal congress has deemed it wise to enact in the exercise of this supreme and exclusive control, provided they are appropriate to the object to be obtained, and not obviously beyond the reasonable scope of the powers granted. *Sherlock* v. *Alling*, 93 U. S. 103.

The exemption from seizure by private suitors, both at common law and in the admiralty, of the proper instruments of government, when not the result of special legislation, is based entirely upon that rule of public policy established by the courts, which upon grounds the public welfare and necessity protects from private sequestration property required

for the exercise of governmental powers, either inherent or delegated. But I can find but little analogy between this exemption and the claim to be exempt from a penal forfeiture inflicted by a valid law enacted by a sovereign power having express power granted to it to make the law. In the present cases the state and the federal government are exercising authority within the same territorial limits, and their claims in these cases conflict in regard to a matter concerning which the state has transferred her sovereignty to the United States, and with regard to which she has agreed that the federal authority shall be supreme and exclusive. This granted power to enact the law implies the power to make the law effective, and to prescribe and enforce penalties for its infraction.

Although, therefore, there is great force in the argument that these vessels, being instrumentalities used by the state for the execution of its proper governmental powers, should be exempt from seizure, it is an argument more properly to be addressed to congress than to the court. It is based solely on a supposed public policy, and I can find no justification for the court declaring a rule of public policy with regard to a matter in respect to which congress has declared the law.

It is urged that it should be presumed, in favor of a sovereign state of the Union, that she will give to her steamers such inspection and attention as will render them safe for those she puts in charge of them, and nowise dangerous to persons or vessels engaged in commerce upon the navigable waters within the state. Congress may so declare. With regard to the public vessels of the United States, and the vessels of other countries, (except foreign vessels carrying passengers from any port of the United States,—act of February 28, 1871,) it has so declared. With regard to foreign vessels there would be no doubt difficulty in framing a law susceptible of execution, and perhaps congress may well rely upon the inspection generally provided by other nations with regard to their own steam-vessels as sufficient to secure the safety of general navigation. The provisions of the legislation of congress with regard to inspection of the hulls and boilers of steam-vessels are intended, not alone for the protection of those on board the vessel itself, but for the protection of all other persons and property engaged in navigation, which might in any way be subject to damage from any accident which might happen for want of that attention to safety which the inspection enforces. It was said by the supreme court in the case of *The Repauno*, (*Hartranft* v. *Du Pont*, 118 U. S. 226, 6 Sup. Ct. Rep. 1188:)

"The law was passed also to protect the lives and property of persons in other boats and at the wharves. * * * The people in other boats, who passed her on the water, or those who stood on the docks where she landed, were entitled to the same protection which the law provided against the explosion of the boilers of larger craft."

It is, of course, quite within the power of congress to exempt the vessels of the state of Maryland from inspection if they deem it wisest to do so; but I have not found it possible for the court to so construe the law, as it at present stands; and in considering the question of an exemption, because of the general rule of public policy in obedience to

which courts exempt instruments of government from seizure, it should be borne in mind that the same rule, so applied, would exempt the property and instruments used by cities and counties, such municipal corporations being themselves mere instrumentalities of the state for the convenient administration of local government. *Meriwether* v. *Garrett*, 102 U. S. 511; *Klein* v. *New Orleans*, 99 U. S. 149; *The Fidelity*, 16 Blatchf. 569; *The Protector*, 20 Fed. Rep. 207. The result of that rule, so applied, would therefore be that no penalty could be enforced for refusal to submit to inspection any of the numerous steam police boats, fire extinguishing steamers, relief-boats, ice-boats, and other steam-vessels used by the large seaboard cities; and they would ply among the vessels in crowded ports, and lie at the docks among other shipping, free from supervision of any kind prescribed by congressional enactments. The question of public policy would therefore not be so narrow a one as might seem upon first impression.

With regard to the alleged violations of the sections specially applicable to steamers carrying passengers or merchandise, I do not find that these steamers are liable. They never carry either passengers or merchandise for hire, and if persons or property, not required for the public service in which these vessels are intended to be employed, are by the allowance of those in charge of them sometimes carried, it is not by the authority of the state, and not for compensation, and not within the purpose for which they are maintained. The sections relating to carrying passengers and merchandise are applicable to a steam-vessel solely because of the use to which she is applied, and I do not find that these vessels are so used.

I will sign a decree for the penalties for failure to have the hulls and boilers inspected in the years 1885 and 1886.