# THE F. C. LATROBE.

### VASEY, Master, etc., *v.* MAYOR, ETC., OF BALTIMORE, Owner, etc.

*(District Court, D. Maryland.* April 13, 1886.)

COLLISION—LIABILITY OF MUNICIPAL CORPORATION FOR DAMAGE DONE BY ICE-BOAT IN RENDERING GRATUITOUS SERVICE TO ANOTHER VESSEL.

An ice-boat, maintained by the city of Baltimore to free the harbor from obstructions, and to aid the commerce and navigation of the port, came into collision with a British steamer anchored in the harbor. *Held,* that the ice-boat was in fault, and that the owner, although a municipal corporation, was liable *in personam. Held,* following *The Fidelity,* 16 Blatchf. 569, that public policy required that the city should not be deprived of the use of the ice-boat, but that the fact that no lien could attach to the offending boat furnished no ground for denying the remedy against the city *in personam.*

In Admiralty. Collision.
*John H. Thomas,* for libelant.
*Bernard Carter,* for respondent.

MORRIS, J. On seventeenth January, 1886, the British steam-ship Sylvia having been loaded in the harbor of Baltimore, and made ready for sea, had proceeded to the quarantine grounds, and was lying there at anchor, waiting for her engineer, and some small stores, and a pilot to be put on board. The F. C. Latrobe is a large and powerful side-wheel steamer, built for the mayor and city council of Baltimore, to be used as an ice-boat to break the ice, and keep the harbor of Baltimore and the approaches free from obstruction by ice, and to aid the commerce and navigation of the port. On the seventeenth January, and prior thereto, the harbor had been more or less obstructed by ice, and the Latrobe had been engaged in breaking it up, and opening the channels. The steam-tug Calvin Whitely had been employed by the agent of the Sylvia to put on board her the pilot, engineer, and stores, and she had also been employed to put a pilot on board another British steamer also ready for sea, which was anchored near the Sylvia. The steam-tug was disabled by an accident in the floating ice, and signaled for assistance. The Latrobe, which was not far off, came to her, and, at the request of the master of the tug, took off the persons and stores destined for the sea-going steamers, and proceeded to do what the tug had been disabled from doing. The pilot was safely put on board the first steamer, but, in attempting to get along-side of the Sylvia, the Latrobe struck the Sylvia a heavy perpendicular blow with her bow, just forward of the poop, on the starboard side, and did the Sylvia such damage that she was obliged to return to the port for repairs. The blow was the result of a miscalculation on the part of the master of the Latrobe with regard to the resistance of the ice, which was solid

on that side of the steamer on which he approached, and which was broken on the other side. He miscalculated the strength of the ice, and also the effect which the reversal of his starboard side-wheel was expected to have in turning the bow of the ice-boat away from the steamer.

There is no doubt that there was difficulty in bringing so large and heavy a vessel as the ice-boat along-side another vessel, especially when her navigation was impeded by ice; but, if the difficulty was really so great as to make it hazardous, it should not have been attempted. The service attempted was not a pressing necessity, and had not been requested by the agents or master of the Sylvia. Such a collision cannot be regarded as an inevitable accident, and, however commendable the motive of the master of the ice-boat, that vessel must be held in fault.

The ice-boat is owned by the mayor and city council of Baltimore, a municipal corporation of the state of Maryland, having power to provide for the preservation of the navigation of the harbor and the river, within four miles of the city, and with authority to levy a tonnage duty of two cents per ton on every vessel entering or clearing at the port. It is contended on behalf of the respondent that not only is the ice-boat itself not liable to arrest for the reason that the public exigency requires that it shall be exempt from seizure and sale, as was decided in *The Fidelity*, 16 Blatchf. 569, but it is also now contended that the municipal corporation is not liable in an action *in personam* as the owner of the boat. It is urged that the doctrine of *respondeat superior* does not apply, because it is said that this is the case of a municipal corporation in the exercise of its governmental powers, performing through its officers a public service, from which it derives no special benefit in its corporate capacity. It is true that in certain cases it is held that where a duty for the general welfare has been imposed upon a municipal corporation, the persons employed to discharge such a duty are not servants or agents of the municipality, but rather public officers, charged with the performance of duties, and that for their negligence or improper conduct no action can be maintained against the municipality. 2 Dill. Mun. Corp. §§ 772–777; *Hafford* v. *City of New Bedford,* 16 Gray, 297; *Fisher* v. *Boston,* 104 Mass. 87.

There are two considerations, however, which, in my judgment, relieve the libelant's case from the difficulties suggested by this defense.

The first is that, by the maritime law, the liability of the owner of a vessel for the negligence of the master is not controlled solely by the rules of other systems of law applicable to the relation of master and servant. The rule of the maritime law is that the owner is always personally liable for the negligence or unskillfulness of those navigating his vessel, except only in those cases in which the possession and control of the vessel has passed to a charterer or other person so completely that the other person not only appoints the master

and crew, but directs both the destination and employment of the vessel, and her mode of navigation. Abb. Adm. (12th Ed.) 37; *The China*, 7 Wall. 68, 70; *The Merrimac*, 14 Wall. 202; *Sherlock* v. *Alling*, 93 U. S. 108.

This almost universal rule, restricted by the limitation confining the extent of the recovery against the owner to the value of his vessel, or some portion of its value, has received the widest approval, as being founded on natural justice. Under it the vessels of all nations frequent the avenues of commerce upon equal terms, and their owners are alike responsible for faults of navigation resulting in injury to persons or property. Exceptions to the rule have been denounced by admiralty courts as "fruitful of injustice," and not to be tolerated, except upon imperative necessity. *Sherlock* v. *Alling*, 93 U. S. 108. So strong and general is the recognition of the justice of this rule which holds the owner responsible for the damage done by his vessel, that, even with respect to public armed vessels, nations seldom neglect to make compensation to their own citizens, or those of other nations, in cases in which, upon proper investigation, it appears that the public vessel was in fault. A municipal corporation, like strictly private corporations, is liable to suit, and ordinarily is liable for the negligence of its agents. *Barnes* v. *District of Columbia*, 91 U. S. 540; *Weightman* v. *Washington*, 1 Black, 50; *County Com'rs* v. *Duckett*, 20 Md. 468.

And when, in the performance of any duty, either imposed upon or assumed by it, the municipality employs maritime instrumentalities, I think it should be held answerable under the maritime law, with those exceptions only which public policy absolutely requires. If the vessel belonging to the municipality is used by it as a necessary instrument in the exercise of some municipal function, then, as was held by the chief justice in the case of *The Fidelity*, public policy requires that the municipality shall not be deprived of its use, and therefore the maritime lien cannot attach; but, to my mind, no sufficient necessity or reason has been suggested for denying a remedy against the municipality as the owner of the offending vessel.

The second consideration which forbids the application to this case of the defense contended for, is that unless the municipal corporation, when the tort complained of is committed, is engaged in a service in which it has no particular interest apart from the benefit to the public, and from which it derives no special benefit in its corporate capacity, it cannot claim the exemption. It is the public use, and not the mere ownership, which avails to protect from liability. *The Siren*, 7 Wall. 152.

The ordinance of the city directing the ice-boat Latrobe to be built, provides that the boat shall be used to keep the harbor and approaches free from obstruction by ice, and that, in all cases of special use of the boat in the way of relief or otherwise, the harbor board shall have

power to make such charge for her services as may seem to them just and reasonable. The service being performed by the Latrobe at the time the Sylvia was damaged, was a special use of the boat, as distinguished from her general use in keeping the harbor and approaches open and free from obstruction from ice. Her master states that when, at the request of the master of the tug, he attempted to get along-side of the Sylvia, and to perform the service which the tug had been disabled from doing herself, he was rendering an entirely gratuitous service. But this claim of exemption from the acts of the master of a vessel belonging to the city must rest upon the public use of the vessel, and if at the time of the act complained of the vessel was engaged in a special use, for which compensation might be charged, the reason for the exemption fails. This is in accordance with the ruling in *Oliver* v. *Worcester*, 102 Mass. 499. In that case the servants and agents of a city negligently suffered the land adjoining a building belonging to the city to be in a dangerous condition, and the court, while holding that if the building had been for municipal purposes solely the city would not have been liable, decided that, as part of the building was rented out to tenants, the city was liable to the same extent as any private owner. This doctrine is also supported by the case of *Mersey Docks* v. *Gibbs*, L. R. 1 H. L. 93, and 11 H. L. Cas. 686.

It is further urged, however, by counsel for the respondent, that as under the ruling in the case of *The Fidelity* there is no lien upon the vessel, for that reason there can be no responsibility on the part of her owner, citing the admiralty rule announced by Dr. Lushington, and frequently quoted, that the liability of the ship and the responsibility of the owners are convertible terms, and that if the ship is not liable the owners are not responsible. This, although often a convenient test, is by no means a rule of universal application. It is controlled by so many well-known exceptions that it may be said to be of little value as a guide in cases which are at all out of the ordinary course of maritime dealings. It is no argument in favor of denying the injured party his remedy *in personam* against the owner to say that, because of public convenience or necessity, he must not be allowed his lien upon the offending ship; but quite the contrary, and especially in a case in which, but for these considerations of public policy which prevent the seizure of the ship, he would have the protection both of a privilege against the ship and the responsibility of the owner.

I think the proof shows that the whole of the 12 days' detention claimed was the legal and natural consequence of the collision, and I allow that number of days; but as the demurrage of £40 a day, which I allow in accordance with the demurrage scale adopted for charter-parties, is a liberal allowance, I have thrown out of the account of expenditures and charges all doubtful items.

The damages for detention amount to 12 days, at £40, -      -      $2,328 00
Disbursements in consequence of collision, -      -      1,968 80

$4,296 80
Interest on $1,968 80, from January 28, 1886,      -      -      24 60

$4,321 40

Decree for libelant.