### HENDERSON v. CITY OF CLEVELAND.

(District Court, N. D. Ohio, E. D. April 6, 1899.)

#### No. 2,227.

1. COLLISION—INJURY TO MOORED VESSEL—BURDEN OF PROOF.

   Where a sailing vessel, safely moored to a dock, in a proper place, and unable to move, is struck and injured by a steam vessel, the burden rests upon the latter to exonerate itself from the charge of negligence.

2. SAME—CARE REQUIRED OF FIRE TUG.

   A fire tug owned by a city, and forming a part of its fire department, is not exempt, by reason of its employment, from the duty of exercising ordinary care to prevent collision with other vessels, though what constitutes ordinary care, as a question of fact, may vary with the exigencies of the service in which it is at the time engaged.

3. SAME—LIABILITY OF CITY FOR MARITIME TORTS.

   The rule of the maritime law, which holds the owner of a vessel liable for injuries inflicted through negligence or misconduct in its navigation to the extent of his interest in the vessel, is not based on the relation of master and servant, but rests upon the fact of ownership alone, the vessel itself being regarded as the offender; and the principle on which a city is held to be exempt from liability for negligent acts of its firemen, the reason being that they are not its servants in its corporate capacity, has no application to the case of a marine injury resulting to another vessel from the negligent handling of a fire tug owned by the city. For such an injury the tug itself is liable, and the city may be held responsible in a court of admiralty to the extent of the value of the tug.

In Admiralty.

Roger M. Lee, for libelant.
Miner G. Norton and Ford, Boyd & Crowl, for respondent.

RICKS, District Judge. This is a proceeding in admiralty against the city of Cleveland for injuries sustained by the libelant through the alleged negligence and carelessness of the fire tug John H. Farley. Mr. Henderson alleges that he is the sole owner of the schooner Typo;

that said vessel is 130 feet long, of several hundred tons burden, and has been duly enrolled and licensed for, and engaged in, trade and navigation upon the Great Lakes and their connecting and contributory waters. He avers: That the city of Cleveland was the sole owner of a certain steam vessel, called the John H. Farley, which was at all times herein mentioned a vessel of the United States, of more than 10 tons burden, duly enrolled, and engaged in navigation upon the Cuyahoga river; which said river was at all times herein mentioned, and is, a navigable water way of the United States. That on November 7, 1897, said schooner Typo lay in said Cuyahoga river, safely moored at a dock, a short distance above Seneca Street Bridge, which was a customary and proper place for such a vessel to be moored; and while so moored at said dock, and stationary, the weather being clear, said steamer John H. Farley, about 1 o'clock p. m. of said last-mentioned day, negligently collided with the stern of said schooner, damaging said schooner in the manner hereinafter set out. Said collision occurred without any fault on the part of those in charge of the said schooner Typo, which, being moored at said dock, was powerless to avoid said collision; and said collision was caused solely by the negligence and want of care and skill on the part of those navigating said steamer John H. Farley. There is no dispute about the fact that the schooner Typo was safely moored at a dock near the Seneca Street Bridge, which was and is a suitable and proper place for vessels to moor engaged in the business which said schooner was carrying on at that time. Being a sailing vessel, moored to a dock, without power to care for herself, the rule is settled that, under such circumstances, a moving tug, coming down upon said schooner from any direction, must use at least ordinary care in keeping out of the way of said schooner so as to avoid doing her damage. The defense is that the tug Farley is a fire boat, owned by the city of Cleveland, and a very valuable and important part of the outfit for fighting fires, especially on the flats and along the river banks. The said tug Farley has a basin cut on the south side of said river, which is called by the fire department a station for the fire tug Farley. On the opposite side of the river, only a few hundred feet from it, is the standpipe into which the tug forces water up the hill and along the river, aiding the fire department in extinguishing fires. The defense is that a fire tug, being engaged in this important and necessary and governmental work, enjoys a sort of immunity from claims for damage inflicted upon the vessel property along the river, because, as counsel for the city say, it is engaged in this important work, and it is better that occasionally damage be done, by the speediest movements of the fire tugs, to craft along the river, than to have a million dollar fire have time to catch and spread while the vessel is detained by moving cautiously so as to protect vessels and other property on the banks of the river. This is true in a qualified sense. In this particular case it is not necessary to determine as to what extent the city's contention is correct, because there was an abundance of time for the Farley to have reached the standpipe without running any risk to itself

or other vessels in that vicinity. But the general proposition advanced is true in a qualified sense. Under the most imminent danger, and where speed and prompt action are most necessary, still fire tugs must exercise ordinary care in doing their work. The contention of the city's counsel would be a dangerous precedent. If fire tugs, under the pretext of immunity from danger, could move rapidly up and down the river, and around bridges and bridge protections, bumping and damaging vessel property moored at the docks, and helpless, without regard to the damage inflicted, they would enjoy a license which it would be unsafe to permit to continue. This court would be slow to announce any opinion that would in any way hamper these fire tugs in the efficient discharge of their duty. Every care should be taken to protect them when, by the exercise of ordinary care, damage results from their movements; so that the court, in fixing the rule to control their movements, says that in such emergencies only ordinary care is required on their part, and when they use ordinary care they will be protected. But, as before stated, in this case I do not think ordinary care was used. When the alarm was sounded, the tug could not move down the stream on account of two boats that were moored at the docks, so that, as Jones, the pilot, expresses it, "I had to sheer over across the river to the pipe line, and in going over struck the Typo. Stern of the Farley struck the Typo." It was necessary for the Farley to pass around the bridge protection in order to enable her to get to the pipe line; but, in passing around the bridge protection, she went further beyond it than was needed, the witnesses testifying that the space was from 40 to 50 feet; and in doing so her stern struck the stern of the Typo, and broke in her frames and water table for some distance. Several expert witnesses testified that the movements of the Farley were unseamanlike.

But it is not necessary to discuss further the facts upon which the charge of negligence is based. The Typo, being a sailing vessel, safely moored to the dock, and unable to move to protect herself, proof of injury to her makes it necessary that the owner of the tug causing the injury should defend and exonerate itself from the negligence charged. See The Virginia Ehrman and The Agnese, 97 U. S. 315, and the cases there cited. I am well aware that in some states the courts have gone to the very extreme, and have held that fire engines and hose carts, being driven to a fire, are exempted from all claims for negligence growing out of accidents or injuries caused by the speed at which they were going to the fire. But there is a distinction between the law of a state relating to fire engines and the rules in admiralty which relate to fire tugs under the same allegations of negligence. In admiralty, the party who has been wronged by a vessel has his right of action against the vessel in rem, or against the vessel and its owner in personam. The tug or fire vessel is responsible for injuries committed by its own crew, and, to the extent of the value of the vessel, is liable to the party injured. This principle runs through the whole course of admiralty practice and admiralty law, as laid down by the courts. Judge Grosscup, in the case of

Thompson Nav. Co. v. City of Chicago, 79 Fed. 984, repudiates the law as laid down in some of the states, and says:

"In admiralty the rule is this: The vessel committing the unlawful injury is considered the offender, and the owner is mulcted to the extent of his interest in the vessel; not because he stands in the relation of principal or master to the crew, but alone because of the fact of ownership. Thus, under laws preventive of piracy or smuggling, the vessel may be seized, condemned, and sold, notwithstanding the crew committing the unlawful acts were engaged by the owner for a lawful enterprise only, and were, in the commission of the unlawful acts, wholly outside the scope of their engagement. U. S. v. The Malek Adhel, 2 How. 209. Commenting upon this apparent anomaly of maritime jurisprudence, and showing that the doctrines advanced in the case then under consideration were not different from those prevailing generally in maritime law, Mr. Justice Story, at page 234, speaks as follows: 'The ship is also, by the general maritime law, held responsible for the torts and misconduct of the crew and master thereof, whether arising from negligence or a willful disregard of duty; as, for example, in cases of collision and other wrongs done upon the high seas or elsewhere within the admiralty and maritime jurisdiction, upon the general policy of that law which looks to the instrument itself, used as the means of the mischief, as the best and surest pledge for the compensation and indemnity to the injured party.' It is thus apparent that the liability of the owner, to the extent of his vessel, for injuries caused in a collision by negligence or misconduct, is not dependent upon the relation of master and servant, * * * but rests solely upon the fact of ownership. * * * At common law the city is not liable for the negligent acts of its fire department, for the reason that the members of the fire department are not the servants of the city in its corporate capacity. The negligence of the firemen, therefore, is not attributable to the city. But in the case under consideration the injury done by the vessel, including its crew, to the libelant, is chargeable to the owner by virtue of the mere fact of ownership, and can be collected directly by seizure of the vessel, or indirectly by a suit in personam. In either case the liability rests, not in the relation of principal and agent, or master and servant, but in the bare fact of ownership."

In 28 Fed. 377, in the case of The F. C. Latrobe, Judge Morris, in discussing a question pertinent to the one now under consideration, says:

"By the maritime law, the liability of the owner of a vessel for the negligence of the master is not controlled solely by the rules of other systems of law applicable to the relation of master and servant. The rule of the maritime law is that the owner is always personally liable for the negligence or unskillfulness of those navigating his vessel, except only in those cases in which the possession and control of the vessel has passed to a charterer or other person so completely that the other person not only appoints the master and crew, but directs both the destination and employment of the vessel, and her mode of navigation. This almost universal rule, restricted by the limitation confining the extent of the recovery against the owner to the value of his vessel, or some portion of its value, has received the widest approval, as being founded on natural justice. Under it the vessels of all nations frequent the avenues of commerce upon equal terms, and their owners are alike responsible for faults of navigation resulting in injury to persons or property. * * * So strong and general is the recognition of the justice of this rule which holds the owner responsible for the damage done by his vessel, that, even with respect to public armed vessels, nations seldom neglect to make compensation to their own citizens, or those of other nations, in cases in which, upon proper investigation, it appears that the public vessel was in fault. And when, in the performance of any duty, either imposed upon or assumed by it, the municipality employs maritime instrumentalities, I think it should be held answerable under the maritime law, with those exceptions only which pub-

lic policy absolutely requires. If the vessel belonging to the municipality is used by it as a necessary instrument in the exercise of some municipal function, then, as was held by the chief justice in the case of The Fidelity, 16 Blatchf. 569, Fed. Cas. No. 4,758, public policy requires that the municipality shall not be deprived of its use, and therefore the maritime lien cannot attach; but, to my mind, no sufficient necessity or reason has been suggested for denying a remedy against the municipality as the owner of the offending vessel."

In 63 Fed. 298, in the case of Workman v. Mayor, etc., of the City of New York, Judge Brown, after stating the facts of the case, says:

"The fire boat belonged to the city, but was under the control and management of the fire department, the heads of which are appointed by the mayor. It is contended that neither the mayor, aldermen, etc., nor the fire department, is legally answerable for these damages. Not the mayor, etc., it is said, because, though owner, it had no control over the management of the vessel, and its duties were not corporate duties. The fire department, it is said, is not liable, because not a corporation capable of being sued, nor having any funds for the payment of any decree. It is certainly a startling proposition that all the shipping of·this port, foreign and domestic, should be at the mercy of the city fire department boats, and liable to be negligently run down and sunk at any moment, without responsibility for damages. By the maritime law, both the vessel and the owner are ordinarily liable for such a marine tort. But if the vessel is in the public service, she is not allowed to be withdrawn therefrom by arrest and sale, for reasons of the public convenience."

But all the dangers that might accrue to the city by virtue of the law thus announced could easily be remedied by legislation. A libelant proceeding in rem against a vessel which did him injury would not undertake to have the vessel seized while it was discharging its duty as a branch of the fire department. While the city was burning, the marshal, with his writ, could not undertake to tie up the fire tugs until the danger was past. The law, therefore, which in some of the states has been declared, as hereinbefore stated, on account of public policy, does not apply to the rules and practice in admiralty, and cannot therefore be sustained. This result necessarily makes it the duty of the court to overrule the exceptions to the defendant's answer, and to find that the tug John H. Farley and its owners are liable for the damage incurred. When this damage has been ascertained by a commissioner, the case will be ripe for further proceedings.