**ROSENBERG BROS. & CO. v. UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION.**

**CALIFORNIA WINE ASS'N v. SAME.**

(District Court, N. D. California, Third Division. December 26, 1923.)

Nos. 17692, 17693.

1. **United States** ⚙︎125—**Governmental agency engaged in private business subject to suit.**

When a governmental agency engages in strictly private business in competition with private persons, it loses many of its special privileges, and is to be regarded as far as possible as being subject to the same rules as such private persons.

2. **United States** ⚙︎125—**Immunity from suit not to be enlarged.**

The tendency is to restrict, rather than to enlarge, the immunity of the government from suit, and to hold it more and more to the same liability as a private corporation, when it engages in a private business in competition with private enterprise.

3. **United States** ⚙︎125—**Suit against Fleet Corporation held not one against United States.**

A suit against the Emergency Fleet Corporation to recover for cargo lost by one of its ships, operated as a merchant vessel, is not one against the United States.

⚙︎For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. Admiralty ⬅=34—Limitation of suits in Admiralty Act March 9, 1920, § 5, held not to apply.**

A suit against the Emergency Fleet Corporation to recover for cargo lost by one of its ships operated as a merchant vessel *held* not subject to the limitation imposed by Suits in Admiralty Act, § 5 (Comp. St. Ann. Supp. 1923, § 1251¼d).

**5. Admiralty ⬅=6—Court held to have jurisdiction of suit against Fleet Corporation.**

Where a ship owned and operated by the Emergency Fleet Corporation as a merchant vessel deviated from her course on a voyage, stranded, and with her cargo became a total loss, suits by cargo owners against the Corporation to recover for cargo lost are not without the jurisdiction of the court because the vessel is not within the district or the United States.

In Admiralty. Suits by Rosenberg Brothers & Co., a corporation, and by the California Wine Association against the United States Shipping Board Emergency Fleet Corporation. On exceptions to libels. Overruled.

J. M. Mannon, Jr., Farnham P. Griffiths and McCutchen, Olney, Willard, Mannon & Greene, all of San Francisco, Cal., for libelants.

Ira S. Lillick, of San Francisco, Cal., for respondent.

PARTRIDGE, District Judge. These two actions arise from the loss of the steamer West Aleta. In the Rosenberg Case, the libel alleges that the libelant shipped on the West Aleta 1,500 bags of rice, consigned to Rotterdam. In addition, libelant delivered to respondent 4,000 bags of rice for shipment on the Cockaponset for Rotterdam, but that respondent diverted 680 bags of this second lot, and shipped them on the West Aleta. The value of this rice is alleged to be the sum of $23,716. In the California Wine Association Case, libelant shipped on the West Aleta 11,000 barrels of wine, for shipment to Cardiff, and 2,992 barrels of wine and 1,108 barrels of brandy for shipment to Rotterdam. The value of the wine and brandy is alleged to be $642,871.

All the goods in both cases were shipped from San Francisco. Both libels then allege that the West Aleta deviated from her voyage and proceeded on an entirely different voyage to Hamburg, and that during this deviation she stranded upon Tershelling Island in the North Sea, and as a result of the deviation the ship and goods became a total loss. Both libels likewise allege that "at all times herein mentioned" the vessel was an American steamer operated by respondent solely as a merchant vessel.

To these libels exceptions are filed directly attacking the jurisdiction of the court. The reasons for this attack are that it affirmatively appears that at the time of the filing of the libels the West Aleta was not operated as a merchant vessel, nor was she within the territorial limits of the United States or its possessions, nor within the jurisdiction of the court. In addition to that, the exceptions set up that at the time of the filing of the libel more than a year had elapsed since the going into effect of the Suits in Admiralty Act of March 9, 1920,

and that therefore the causes of libel are barred by section 5 thereof (Comp. St. Ann. Supp. 1923, § 1251¼d).

There is thus squarely presented to the court the questions:

(1) What is the status of a libel for the recovery of damages sustained by the loss of goods on a vessel operated by the Emergency Fleet Corporation, when the suit is filed more than one year after the act went into effect?

(2) Do the sections of the statute limiting actions to causes in which the vessel was employed in the merchant service and physically within the United States, apply where she has, by wrongful deviation, become a total loss?

The principle that the sovereign cannot be sued without his consent found no ready acceptance in these United States. It was, of course, settled law in England, at the time of the Revolution; although, as a practical matter, leave was almost always granted upon a petition of right. The doctrine was strongly urged in the Federalist, No. 81, in the following language:

"It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without his consent. This is the general sense, and general practice of mankind."

But it certainly was not considered the "general sense" of this country by the first Chief Justice of the Supreme Court of this republic. On the contrary, he most vigorously and picturesquely repudiated it, as unsuited to a free people—a people who were themselves the sovereign, and the only sovereign, ruling themselves by their duly elected representatives. Chisholm v. Georgia, 2 Dall. 419, 1 L. Ed. 440. In the same case Mr. Justice Wilson used this language:

"To the Constitution of the United States the term 'sovereign' is totally unknown. There is but one place where it could have been used with propriety. But even in that place it would not, perhaps, have comported with the delicacy of those who ordained and established that Constitution. They might have announced themselves sovereign people of the United States; but, serenely conscious of the past, they avoided the ostentatious declaration."

In this case, however, the first Chief Justice did perceive a difference between a suit against a state, and against the United States. The language is as follows:

"I perceive, and therefore candor urges me to mention, a circumstance, which seems to favor the opposite side of the question. It is this: The same section of the Constitution which extends the judicial power to controversies 'between a state and the citizens of another state' does also extend that power to controversies to which the United States are a party. Now, it may be said, if the word 'party' comprehends both plaintiff and defendant, it follows, that the United States may be sued by any citizen, between whom and them there may be a controversy. This appears to me to be fair reasoning; but the same principles of candor which urge me to mention this objection, also urge me to suggest an important difference between the two cases. It is this: In all cases of actions against states or individual citizens, the national courts are supported in all their legal and constitutional proceedings and judgments, by the arm of the executive power of the United States; but in cases of actions against the United States, there is no power which the courts can call to their aid. From this distinction, important conclusions are deducible, and they place the case of a state, and the case of the United States, in very different points of view. I wish the state of society was so far

improved, and the science of government advanced to such a degree of perfection, as that the whole nation could, in the peaceable course of law, be compelled to do justice, and be sued by individual citizens. Whether that is, or is not, now the case, ought not to be thus collaterally and incidentally decided: I leave it a question." 2 Dall. 477, 1 L. Ed. 465.

Cohens v. Virginia, 6 Wheat. 380, 5 L. Ed. 257, is usually cited as the first case in which the Supreme Court recognized the general doctrine of immunity from suit. This, however, merely depends upon the general language of Chief Justice Marshall. And in fact the Chief Justice, in one of the greatest expositions of true political opinions ever written in any language, held that jurisdiction did attach. This case was, like Chisholm v. Georgia, a suit against a state, and did not in any wise involve the question of a suit against the United States. Almost 100 years after the decision in Chisholm v. Georgia, Mr. Justice Miller, in United States v. Lee, 106 U. S. 196, 1 Sup. Ct. 240, 27 L. Ed. 171, said:

"And while the exemption of the United States and of the several states from being subjected as defendants to ordinary actions in the courts has since that time been repeatedly asserted here, *the principle has never been discussed or the reasons for it given,* but it has always been treated as an establishd doctrine. United States v. Clarke, 8 Pet. 436; United States v. McLemore, 4 How. 286; Hill v. United States, 9 How. 386; Nations v. Johnson, 24 How. 195, 16 L. Ed. 628; The Siren, 7 Wall. 152, 19 L. Ed. 129; The Davis, 10 Wall. 15, 19 L. Ed. 875."

And while, as Mr. Justice Miller said, no reasons for the principle had ever been given, a most persuasive argument had been made against it by Mr. Justice Wilson in the Chisholm Case. His language is as follows:

"For in the practice, and even, at length, in the science of politics, there has very frequently been a strong current against the natural order of things, and an inconsiderate or an interested disposition to sacrifice the end to the means. As the state has claimed precedence of the people, so, in the same inverted course of things, the government has often claimed precedence of the state; and to this perversion in the second degree many of the volumes of confusion concerning sovereignty owe their existence. The ministers, dignified very properly by the appellation of the magistrates, have wished, and have succeeded in their wish, to be considered as the sovereigns of the state. This second degree of perversion is confined to the old world, and begins to diminish even there. But the first degree is still too prevalent, even in the several states of which our Union is composed. By a state I mean a complete body of free persons united together for their common benefit, to enjoy peaceably what is their own, and to do justice to others. It is an artificial person. It has its affairs and its interests: It has its rules; it has its rights; and it has its obligations. It may acquire property, distinct from that of its members. It may incur debts, to be discharged out of the public stock, not out of the private fortunes of individuals. It may be bound by contracts, and for damages arising from the breach of those contracts. In all our contemplations, however, concerning this feigned and artificial person, we should never forget that, in truth and nature, those who think and speak and act, are men.

"Is the foregoing description of a state a true description? It will not be questioned, but it is. Is there any part of this description, which intimates, in the remotest manner, that a state, any more than the men who compose it, ought not to do justice and fulfill engagements? It will not be pretended that there is. If justice is not done, if engagements are not fulfilled, is it, upon general principles of right, less proper, in the case of a great number,

than in the case of an individual, to secure, by compulsion, that which will not be voluntarily performed? Less proper it surely cannot be. The only reason, I believe, why a free man is bound by human laws, is that he binds himself. Upon the same principles, upon which he becomes bound by the laws, he becomes amenable to the courts of justice, which are formed and. authorized by those laws. If one free man, an original sovereign, may do all this, why may not an aggregate of free men, a collection of original sovereigns, do this likewise? If the dignity of each, singly, is undiminished, the dignity of all, jointly, must be unimpaired. A state, like a merchant, makes a contract. A dishonest state, like a dishonest merchant, willfully refuses to discharge it. The latter is amenable to a court of justice. *Upon general principles of right, shall the former, when summoned to answer the fair demands of its creditor, be permitted, Proteus-like, to assume a new appearance, and to insult him and justice, by declaring, 'I am a sovereign state?' Surely not. Before a claim, so contrary, in its first appearance, to the general principles of right and equality, be sustained by a just and impartial tribunal, the person, natural or artificial, entitled to make such claim, should certainly be well known and authenticated."*

In United States v. Lee, however, the doctrine is strictly limited. The language is:

"On the other hand. while acceding to the general proposition that in no court can the United States be sued directly by original process as a defendant, there is abundant evidence in the decisions of this court that the doctrine, if not absolutely limited to cases in which the United States are made defendants by name, is not permitted to interfere with the judicial enforcement of the established rights of plaintiffs, when the United States is not a defendant or a necessary party to the suit."

The court then discusses the reasons why the English rule is not applicable to our form of government, and says:

"Under our system the 'people, who are there called· subjects, are the sovereign. Their rights, whether collective or individual, are not bound to give way to a sentiment of loyalty to the person of a monarch. The citizen here knows no person, however near to those in power, or however powerful himself, to whom he need yield the rights which the law secures to him when it is well administered. When he, in one of the courts of competent jurisdiction, has established his right to property, there is no reason why deference to any person, natural or artificial, *not even the United States*, should prevent him from using the means which the law gives him for the protection and enforcement of that right."

Moreover, in the Lee Case, the court quotes this language of Chief Justice Marshall in United States v. Peters, 5 Cranch, 115, 3 L. Ed. 53:

"* * * But it certainly can never be alleged that a mere suggestion of title in a state to property in possession of an individual must arrest the proceedings of the court, and prevent their looking into the suggestion and examining the validity of the title."

The opinion in the Lee Case goes on to consider the contention ·that United States v. Peters should be distinguished from a case in which the officers of the government asserted no title in themselves, but admittedly held only as agents of the government. But the Supreme Court considered that this contention was answered by the case, decided shortly after the Peters Case, to wit, Meigs v. McClung, 9 Cranch, 11, 3 L. Ed. 639. That case was against certain army officers who held land upon which the United States had erected expensive improvements as quarters for a garrison. The Lee Case quotes the language

of Chief Justice Marshall, "that the plaintiff below might sustain his action," as authority for the proposition that the immunity of the United States does not extend to its officers or agents. In Meigs v. McClung, however, this point was not discussed or mentioned, except in the single phrase quoted above and italicized by the Supreme Court. In Wilcox v. Jackson, 13 Pet. 498, 10 L. Ed. 264, also, jurisdiction was entertained in a suit against officers of the army to dispossess them of a fort belonging to the United States. In that case, as in Meigs v. McClung, the point does not appear to have been raised (although in the McClung Case it was among the exceptions). In relying upon Osborn v. United States Bank, 9 Wheat. 738, 6 L. Ed. 204, however, the Supreme Court certainly found unquestioned authority and sound reasoning. The Supreme Court quotes from the Osborn Case as follows:

"A few citations from the opinion of Mr. Chief Justice Marshall will show the views entertained by the court on the question thus raised. At page 842 of the long report of the case he says: 'If the state of Ohio could have been made a party defendant, it can scarcely be denied that this would be a strong case for an injunction. The objection is that, as the real party cannot be brought before the court, a suit cannot be sustained against the agents of that party; and cases have been cited to show that a court of chancery will not make a decree unless all those who are substantially interested be made parties to the suit. This is certainly true where it is in the power of the plaintiff to make them parties; but if the person who is the real principal, the person who is the true source of the mischief, by whose power and for whose advantage it is done, be himself above the law, be exempt from all judicial process, it would be subversive of the best established principles to say that the laws could not afford the same remedies against the agent employed in doing the wrong, which they would afford against him could his principal be joined in the suit.'

"In another place he says: 'The process is substantially, though not in form, against the state, * * * and the direct interest of the state in the suit as brought is admitted; and had it been in the power of the bank to make it a party, perhaps no decree ought to have been pronounced in the cause until the state was before the court. But this was not in the power of the bank, * * * and the very difficult question is to be decided, whether, in such a case, the court may act upon agents employed by the state and on the property in their hands.' In answering this question he says: 'A denial of jurisdiction forbids all inquiry into the nature of the case. It applies to cases perfectly clear in themselves; to cases where the government is in the exercise of its best-established and most essential powers, as well as to those which may be deemed questionable. It asserts that the agents of a state, alleging the authority of a law void in itself because repugnant to the Constitution, may arrest the execution of any law in the United States.' Again: 'The bank contends that in all cases in which jurisdiction depends on the character of the party, reference is made to the party on the record, not to one who may be interested, but is not shown by the record to be a party.' 'If this question were to be determined on the authority of English decisions, it is believed that no case can be adduced where any person can be considered as a party who is not made so in the record.' Again: 'In cases where a state is a party on the record, the question of jurisdiction is decided by inspection. If jurisdiction depend not on this plain fact, but on the interest of the state, what rule has the Constitution given by which this interest is to be measured? If no rule is given, is it to be settled by the court? If so, the curious anomaly is presented of a court examining the whole testimony of a cause, inquiring into and deciding on the extent of a state's interest, without having a right to exercise any jurisdiction in the case. Can this inquiry be made without the exercise of jurisdiction?' "

And the Supreme Court sums up its conclusions as follows:

"This examination of the cases in this court establishes clearly this result: That the proposition that when an individual is sued in regard to property which he holds as officer or agent of the United States, his possession cannot be disturbed when that fact is brought to the attention of the court, has been overruled and denied in every case where it has been necessary to decide it, and that in many others, where the record shows that the case as tried below actually and clearly presented that defense, it was neither urged by counsel nor considered by the court here, though, if it had been a good defense. it would have avoided the necessity of a long inquiry into plaintiff's title and of other perplexing questions, and have quickly disposed of the case. And we see no escape from the conclusion that during all this period the court has held the principle to be unsound, and in the class of cases like the present, represented by Wilcox v. Jackson, Brown v. Huger, and Grisar v. McDowell, it was not thought necessary to re-examine a proposition so often and so clearly overruled in previous well-considered decisions."

And on principle as follows:

"No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it. It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives. Courts of justice are established, not only to decide upon the controverted rights of the citizens as against each other, but also upon rights in controversy between them and the government, and the docket of this court is crowded with controversies of the latter class.

"Shall it be said, in the face of all this, and of the acknowledged right of the judiciary to decide, in proper cases, statutes which have been passed by both branches of Congress and approved by the President to be unconstitutional, that the courts cannot give a remedy when the citizen has been deprived of his property by force, his estate seized and converted to the use of the government without lawful authority, without process of law, and without any compensation, because the President has ordered it and his officers are in possession? If such be the law of this country, it sanctions a tyranny which has no existence in the monarchies of Europe, nor in any other government which has a just claim to well-regulated liberty and the protection of personal rights."

United States v. Lee, together with other cases, is cited by Mr. Justice Hughes in Philadelphia Co. v. Stimson, 223 U. S. 605, 32 Sup. Ct. 340, 56 L. Ed. 570, where he says:

"If the conduct of the defendant constitutes an unwarrantable interference with property of the complainant, its resort to equity for protection is not to be defeated upon the ground that the suit is one against the United States. The exemption of the United States from suit does not protect its officers from personal liability to persons whose rights of property they have wrongfully invaded."

In The Siren, 7 Wall. 152, 19 L. Ed. 129, the steamer had been captured as a blockade runner in the port of Charleston. Libel in prize was filed against her, and she was sold as lawful prize, and the proceeds deposited with the United States. Before the filing of the libel, and while proceeding in charge of a prize captain and crew, the Siren collided with the sloop Harper. The owners of the latter vessel filed an intervening libel after the sale, claiming a lien upon the money for

damages sustained in the collision. Mr. Justice Field sustained jurisdiction in the following language:

"But although direct suits cannot be maintained against the United States, or against their property, yet, when the United States institute a suit, they waive their exemption so far as to allow a presentation by the defendant of set-offs, legal and equitable, to the extent of the demand made or property claimed, and, when they proceed in rem, they open to consideration all claims and equities in regard to the property libeled. They then stand in such proceedings, with reference to the rights of defendants or claimants, precisely as private suitors, except that they are exempt from costs and from affirmative relief against them, beyond the demand or property in controversy. In United States v. Ringgold, 8 Pet. 150, a claim of the defendant was allowed as a set-off to the demand of the government. 'No direct suit,' said the court, 'can be maintained against the United States. But when an action is brought by the United States to recover moneys in the hands of a party who has a legal claim against them, it would be a very rigid principle to deny to him the right of setting up such claim in a court of justice, and turn him round to an application to Congress.' So in United States v. Macdaniel, 7 Pet. 16, to which reference is made in the case cited, the defendant was allowed to set off against the demand of the government a claim for services as agent for the payment of the navy pension fund, to which the court held he was equitably entitled. The question, said the court, was, whether the defendant should surrender the money which happened to be in his hands, and then petition Congress on the subject; and it was held that the government had no right, legal or equitable, to the money."

It is thus apparent that the Supreme Court has given but a reluctant assent to the doctrine of immunity from suit, albeit the principle, in its general form, is well established. It is likewise apparent that the Supreme Court has limited the doctrine to suits directly against the United States, or in rem against property to which it held the title, and not even then, when the officer or agent claimed title in the United States, and that title was put in issue. Now, Mr. Justice Story, in The Malek Adhel, 2 How. 210, 11 L. Ed. 239, summarizes a well-known principle of maritime law as follows:

"The ship is also by the general maritime law held responsible for the torts and misconduct of the master and crew thereof, whether arising from negligence or a willful disregard of duty, as, for example, in cases of collision and other wrongs done upon the high seas or elsewhere, within the admiralty and maritime jurisdiction, upon the general policy of that law, which looks to the instrument itself, used as the means of the mischief, as the best and surest pledge for the compensation and indemnity to the injured party."

Another ancient principle may be expressed in the language of Fletcher Moneton, L. J. [1907] 1 K. B. 669:

"A deviation is such a serious matter, and changes the character of the voyage so essentially, that a shipowner who has been guilty of a deviation cannot be considered as having performed his part of the bill of lading contract, but something fundamentally different, and therefore he cannot claim the benefit of stipulations in his favor contained in the bill of lading"— quoted in Carver on Carriage of Goods by Sea (6th Ed.) p. 398.

[1] These general principles, well established and of ancient cognizance, should be kept in mind in a consideration of the statutes in a case like this. It is equally well established that, when a governmental agency engages in a strictly private business (especially when, as here,

it comes in competition with private persons), it loses many of its special privileges, and is to be regarded as far as possible as being subject to the same rules as such private persons. See Davoust v. City of Alameda, 149 Cal. 70, 84 Pac. 760, 5 L. R. A. (N. S.) 536, 9 Ann. Cas. 847; Western Savings Fund Society v. City of Philadelphia, 31 Pa. St. 183, 72 Am. Dec. 730.

Now, in this case, a corporation formed under the laws of the District of Columbia for war purposes was engaged in time of peace in the strictly merchant trade. It could not be claimed that the ship was performing any public function or any function to which the doctrine of public policy could attach. The stock of the company, it is true, is owned by the United States, and its functions, rights, and liabilities, admittedly are largely a creation of Congressional enactment. But in spite of that it was doing, in the case of the West Aleta, a strictly private business.

I take it that nothing in a material way is so essential now to the manifest destiny of this republic as the healthy development of her foreign trade. It is a matter of common knowledge that production outruns the needs of our people in ever-increasing ratio. Manufactures of every conceivable kind, raw materials, and the products of orchard and farm, must find foreign markets, if our progress is to continue. And the problem of how to find and how to keep those markets is to a considerable degree a problem of transportation. That we must be long dependent upon foreign bottoms for that transportation is unthinkable. In every way possible, therefore, American ships must be made attractive to American cargoes, and American cargoes made profitable for American ships. It would be but a poor means to that end, if the courts were to strain the statutes under which merchant vessels operated by an agency of the government itself should be held free of liability for the loss of goods intrusted to their care.

In a recent case (Director General of Railroads v. Kastenbaum, 44 Sup. Ct. 52, 68 L. Ed. ——, No. 39, October term, 1923, decided November 12, 1923) the Supreme Court had occasion to consider whether the government could be held for damages for false imprisonment for an arrest made on the demand of the detective force of a railroad while under federal control. The court, speaking through the Chief Justice, quotes from Missouri Pac. R. Co. v. Ault, 256 U. S. 563, 41 Sup. Ct. 593, 65 L. Ed. 1087, that "the government undertook as carrier to observe all existing laws," and points out that the action for false imprisonment is "in the nature of a trespass for a wrong or illegal act," and therefore holds the government responsible.

[2] So, throughout our judicial history, the tendency is to restrict, rather than to enlarge, the immunity of the government from suit— to hold it more and more to the same liability as a private corporation, when it engages in a private business, in competition with private enterprise. That this is a sound development no one would deny. That it should apply to admiralty with peculiar force seems to me in the very nature of things, to be apparent.

[3-5] I am therefore constrained to hold that this is not a suit against the government, nor does it come within section 5 of the Suits

in Admiralty Act. Moreover, I cannot conceive that it can be reasonably maintained that, where a ship has gone to the bottom by virtue of a deviation, the court is without jurisdiction because, by virtue of her own wrong, she is not physically within the United States.

The exceptions will therefore be overruled, with 10 days to answer in each case.