## UNITED STATES v. WARREN TRANSP. CO.

(District Court, D. Massachusetts.    June 15, 1925.)

No. 2848.

**1. United States ⬅125—United States in litigation assumes character of sovereign or that of contractor.**

When the United States is a party litigant, it assumes one of two characters; either that of a sovereign or of a contractor.

**2. United States ⬅125—United States, when sued as contractor, not held liable for acts as sovereign.**

When the United States is sued as contractor, it cannot be held liable for obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign.

**3. United States ⬅125—United States, if sued as contractor, liable only as any other defendant.**

If United States is sued as a contractor, it is liable only within limits any other defendant would be in any other court.

**4. United States ⬅126 — Rights of United States suing to enforce rights under business contract measured by those of private individual.**

When the United States sues to enforce its rights under contract into which it has entered in furtherance of some business enterprise lawfully undertaken, its rights are measured by those of a private individual under like contract, except as to laches and limitations.

**5. United States ⬅52½, New, vol. 19A Key-No. Series—Government restrictions on loading coal held not to excuse charterer's delay in furnishing cargo.**

Where United States Shipping Board Emergency Fleet Corporation, organized under Act Sept. 7, 1916, § 11 (Comp. St. § 8146f), on behalf of the United States, chartered a vessel, it exercised business powers of the United States, and charterer cannot avoid liability for demurrage on ground that restrictions of coal committee of Fuel Administration, appointed under National Defense Act Aug. 10, 1917, § 25 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛q), caused the delay, as coal committee exercised sovereign powers.

In Admiralty. Libel by the United States against the Warren Transportation Company. Libelant's exceptions to defendant's answer sustained.

Harold P. Williams, U. S. Atty., and Laurence Curtis, 2nd, Asst. U. S. Atty., both of

Boston, Mass., and H. F. Birnbaum, Asst. Counsel U. S. Shipping Board, of Brighton, Mass., for plaintiff.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for defendant.

BREWSTER, District Judge. This is a libel filed by the United States as owner of the steamship Lake Capens against the Warren Transportation Company, charterers of the vessel. The charter party, dated November 25, 1919, was for the carriage of a cargo of coal from Sewall's Point, Norfolk, Va., to Portland, Me. It contained the following provisions:

"The said party of the second part" (Warren Transportation Company) "doth engage to provide and furnish to the said vessel a full and complete cargo of coal, in bulk under deck. * * *

"It is agreed that three days (Sundays and holidays excepted unless used, and unless loading piers are worked on these days) are to be allowed for loading and discharging, both inclusive, commencing from the time the captain reports vessel ready to receive or discharge cargo, whether or not in berth.

"For each and every day's detention beyond said time by default of said party of the second part, or agent, 25 cents per ton on bill of lading weight per day and pro rata for portion of a day shall be paid by said party of second part, or agent, to said party of the first part or agent."

On November 1, 1919, the bituminous coal miners went on strike, and the government, acting throught its Fuel Administrator, undertook to regulate the distribution and transportation of coal by requiring that all vessels loading at Norfolk should obtain a permit. These permits were issued at Norfolk by a board known as the "regional board" until December 2, 1919, when all outstanding permits by the regional board were revoked, and thereafter permits were issued from a central board at Washington.

The libel claims demurrage under the terms of the charter party for demurrage at the rate of 25 cents per ton per day for a period of a little over six days which intervened between the time when the Lake Capens reported at Norfolk and the time the loading of the cargo was completed.

The respondent has paid demurrage amounting to $521.16, leaving a balance due according to the contention of the government of $3,718.60.

In its answer and amended answer the respondent sets up among other defenses that, during the period covered in the libel, the United States, through its agents, the Fuel Administrator and the Director General of Railroads and Coal Committee Agencies, exercised complete control over the transportation of coal from the mines to Sewall's Point and the delivery of said coal on board vessels at Sewall's Point; that, prior to the execution of the charter party, the respondent procured from the proper agency of the United States government a permit to load coal on board the Lake Capens at Sewall's Point consigned to Portland, Me.; that the Lake Capens arrived at Sewall's Point December 3, 1919; that the libelant, on December 2, 1919, without warning, canceled and revoked said permit, and the loading of said steamer at the time she arrived had thereby been rendered impossible by the acts of the libelant, and the steamer lay off Sewall's Point until December 9, 1919, when the libelant granted a new permit to load the cargo; that "the United States Shipping Board and United States Shipping Board Emergency Fleet Corporation were at this time acting as agents of the United States government in the operation of its merchant fleet, employing certain local shipping companies as operating agents, one of which was the West India Steamship Company, which executed the charter party in this case. At the request of the Fuel and Railroad Administrators the United States Shipping Board and the United States Shipping Board Emergency Fleet Corporation had instructed the local operators of its vessels, including the steamship Lake Capens, to charter them to carry coal to New England in preference to export voyages, and its vessels, in so far as possible, including the steamship Lake Capens were so used in compliance with said request. The acting agents of the Fuel Administrator, the Coal Committees, were given discretions to grant and revoke permits as they deemed expedient, and, in the exercise of these discretions, they made out lists of preferred consignees, and granted permits for coal to be carried by these consignees during the period in which the permit was withheld in the present case. At no time was there a general embargo or public or general prohibition against the distribution of bituminous coal to New England."

The libelant has excepted to that part of respondent's answer which relates to this defense of government interference as above outlined, and the only question now before the court is whether these exceptions should be sustained. On the facts alleged in the pleadings it must be conceded that the de-

lay, demurrage for which is claimed by the libelant, was caused by the acts of the Fuel Administration, an agency of the United States government, which, on December 2, 1919, revoked a permit previously granted, and failed to issue a second permit until December 9, 1919.

[1] In this circuit it has recently been held that interference by such governmental regulations did not relieve a charterer from his obligation to pay demurrage under similar provisions of a charter party. Inter-Coast S. S. Co. v. Seaboard Transportation Co. (C. C. A.) 291 F. 13. But in that case the libelant and owner of the vessel was a private citizen. Because of that fact the respondent claims that the case at bar is distinguishable from the Inter-Coast S. S. Company Case, and is not to be controlled by the decision in that case. It points out that the United States is here seeking to recover damages for delay caused by one of its own agencies. In considering this contention of the respondent we are met with certain pertinent and well-established propositions of law. One is that when the United States is a party litigant, it assumes one of two characters; it may appear in the character of a sovereign or in the character of a contractor. Jones v. United States, 1 Ct. Cl. 383; Horowitz v. United States, 45 S. Ct. 344, 69 L. Ed. 736 (decided March 9, 1925).

[2, 3] Another proposition is that when sued as contractor it "cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." Horowitz v. United States, supra. And, again, it has been held that, if sued as a contractor, it is to be held liable only within the same limits that any other defendant would be in any other court. Jones v. United States, supra.

[4] Conversely, when the United States sues to enforce its rights under a contract into which it has entered in furtherance of some business enterprise lawfully undertaken, its rights are measured by those of a private individual who had entered into like contract, except as to laches and limitations to actions. Rosenberg Bros. & Co. v. United States Shipping Board Emergency Fleet Corporation (D. C.) 295 F. 372; United States v. George A. Fuller Co., Inc. (D. C.) 296 F. 178; Maxwell v. United States (C. C. A.) 3 F. (2d) 906; The Henry County, 1924 A. M. C. 1502.

As was pointed out in United States v. George A. Fuller Company, supra: "It has been firmly held, when the sovereign or any branch thereof, national or state, enters into a contract with a private individual, natural or corporate, it does so in its private or business capacity, and not by virtue of its sovereign power, and in so doing submits itself to the same rules of law that under like circumstances govern and control the individual."

Referring again to the Inter-Coast S. S. Company Case, Judge Bingham noted that the charterer by agreeing to furnish the vessel a full and complete cargo of coal impliedly agreed to obtain the necessary permits from the government, and failure to do so constituted default on its part, rendering it liable for the stipulated demurrage.

I am prepared to go with the respondent to the extent of agreeing that, if the United States, in its capacity as shipowner or contractor, had been guilty of any conduct which interfered with the performance by respondent of its contract with the libelant, the same just and equitable principle of law that would prevent a private citizen from recovering damages resulting from such nonperformance would prevent the libelant from recovering in these proceedings. See Riley v. A Cargo of Iron Pipes (D. C.) 40 F. 605; Murray v. George W. Jump Co. (D. C.) 148 F. 123; Wallis v. Inhabitants of Wenham, 204 Mass. 83, 90 N. E. 396, 17 Ann. Cas. 644.

But, if the delay was the result of some act of the United States in its sovereign capacity, and was of a public rather than a private nature, then the Inter-Coast S. S. Co. v. Seaboard Transportation Co., supra, leads to the conclusion that the libelant, whose rights are coextensive with those of private citizens, is entitled to recover, notwithstanding government interference. This case then turns upon the character of the acts of the Coal Committees or of the Fuel Administration, which rendered it impossible for the respondent to load within the stipulated lay days.

[5] The contract, which is the basis of these proceedings, was entered into on behalf of the United States by agents representing the United States Shipping Board Emergency Fleet Corporation. This corporation was organized under the laws of the District of Columbia pursuant to an act of Congress. See Act of September 7, 1916, c. 451, § 11 (39 Stat. 731 [Comp. St. § 8146f]).

In executing this contract the corporation, through its agents, was entering upon a purely commercial transaction. It was not

by that act exercising any governmental powers of sovereignty; it was exercising what some courts have called "business powers of the United States."

As to the powers exercised by the Coal Committees of the Fuel Administration, the situation is quite different. Acting under powers conferred upon him by the National Defense Act of August 10, 1917 (40 Stat. 284, § 25 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛q]), the President, through the Fuel Administration, undertook to regulate the distribution of coal during the coal strike, and as a part of these regulations a system was inaugurated which is described by Judge Bingham in the Inter-Coast Steamship Company Case (above cited) as follows:

" * * * A system was inaugurated, controlled by the central coal committee in Washington, to pass upon the respective needs of consumers, and particularly with reference to priority, which committee functioned locally through the regional coal committees appointed throughout the country. The central coal committee had general charge of the matter in hand, which it directed through the aid of its regional committees. During the first few days in November, it was possible to issue permits for consumers in the first five classes, but on November 10 it became necessary to restrict deliveries to emergency needs of customers in those classes, and soon thereafter to provide instructions that no coal be delivered to industries for operations not immediately essential, except enough to afford necessary fire protection and to avoid serious property damage. On November 21 the Fuel Administrator issued an order prohibiting the export of anthracite coal; on November 22 he issued an order directing that coal dumped in barges, etc., on inland water ways should be subject to diversion, the same as bituminous coal loaded in cars of a common carrier, and authorizing such diversion as might be necessary according to the priority schedule set forth in the order of October 31, 1919; and on December 2, 1919, an order was issued, effective at once, that no coal should be loaded at Hampton Roads without a specific permit from the central coal committee in each instance."

These regulations applied to all coal loaded at Norfolk, Va., and not exclusively to coal loaded on vessels chartered from the United States Shipping Board.·

The Fuel Administration had no control or jurisdiction over the Lake Capens. It

had no connection, directly or indirectly, with the commercial transaction represented by the charter party, and, what is more significant, the United States Shipping Board Emergency Fleet Corporation had no control over the action of the Coal Committees of the Fuel Administration. In issuing permits in furtherance of the regulations of the Fuel Administrator, the Coal Committees were exercising sovereign and not business powers of the government.

If, as alleged in defendant's answer, the Fuel Administrator had requested co-operation on the part of the United States Shipping Board in the distribution of coal, that fact does not, in my opinion, have any bearing upon the issue here presented. It would not tend to render the regulations of the administrator any the less acts of sovereignty or change the character of the acts of either the Shipping Board or of the Fuel Administrator.

Having reached this conclusion, in my opinion it must follow that, so far as this defense of government interference is concerned, the case at bar must be governed by the decision in Horowitz v. United States, supra, and by the Inter-Coast Steamship Company Case, and, this being so, libelant's exceptions to defendant's answer must be sustained, and it is so ordered.