Mr. Justice FIELD
delivered the opinion' of the court.
It is a familia" doctrine of the- common law, that .the *154 sovereign cannot be sued in his own courts without his consent. The doctrine rests upon reasons of public policy; the inconvenience and danger which would follow from any different rule. It is obvious that the public service would be hindered, and the public safety endangered, if the supreme authority could be subjected to suit at the instance of every citizen, and consequently controlled in the use and disposition.of the means required for the proper administration of the government. The exemption from direct suit is, thereiore., without exception^ This doctrine of the common law is equally applicable to the supreme authority of tke nation, the United States. They-cannot be subjected to legal proceedings at law or in equity without their consent; and whoever institutes such proceedings must bring his case within the authority of some act of Congress. Such is the language of this court in United States v. Clarke.*
The same exemption from judicial process extends to the property of the United S/tates, and for the same reasons. As justly observed by the learned judge who tried this case, tjie're is no distinction between suits against the government directly, and suits against its property.
But althotigb direct suits cannot be maintained against the United States, or ágainst their property, yet, when the United States institute a suit, they waive their exemption so far as to allow a presentation by the defeiadant of set-offs, legal and equitable, to the extent of the demand made or property claimed, and when they proceed in rent-, they ' open to consideration all claims and equities in regard to the property libelled. They then stand in such proceedings, with reference to the rights of defendants or claimants, precisely as private suitors, except that they are exempt from costs and from affirmative relief against them, beyond the demand or property, in controversy. In United States v. Ringgold,† a claim of the defendant was allowed as a set-off to the demand of the government. “No direct suit,” said •the court, “can be maintained against the United States. *155 But when an action is brought by the United States to recover moneys in the hands of a party who has a legal claim . against them, it would be a very rigid .principle to deny’to hifn the right of setting up such claim in a court of justice, and turn him round to an application to Congress.” So in United States v. Macdaniel,* to which reference is made in the case cited, the defendant was allowed to set off against the demand of the government a claim for services as agent for the payment of the navy pension fund, to which the court held he was equitably entitled. The question, said the court, was, whether the defendant should surrender the money which happened to,be in his hands,- and then petition Congress on the subject; and'itwas held that the government had no right, legal or equitable, to the money.
For the damages, occasioned -hy collision of vessels át sea a.claim is created against the vessel in fault, iii favor of the' injured party. This claim may be enforced in the adniiralty ■by a proceeding in rem, except where the vessel is'the prop-. erty of the'United State's. In such.case the claim .exists' equally as if the vessel belonged to a. private citizen, bqt for reasons of public policy, already stated, cannot be enforced by direct proceedings against thé vessél. . It stands, in that, respect, like a claim against the government, incapable of enforcement without its consent, anfl unavailable for any purpose.
In England, when the damage is inflicted by a vessel belonging to the crown, it was formerly held that the remedy must be sought against the officer incoinmanctof the offending ship. But the present practice is tó flle a libel 'in rem., upon which the court directs the registrar to write to "the lords of the admiralty requesting an appearance .on behalf of the crown — which is generally given — when the subsequent proceedings to decree are conducted as in other . cases.† In the case of The Athol,‡ the court refused, to issue a monition to the lords of the admiralty to appear in a suit for damage by collision, occasioned to a vessel by a ship of *156 the crown; but the,lords having subsequently directed an appearance to be .entered, the court proceeded with the case, and awarded damages. As no warrant issues in these cases for the arrest of the vessels of the crown, and no bail is given on the appearance, it is insisted that they are brought simply to ascertain the extent of the damages, and that the decrees are little more than awards, so far as the government is boncerned. This may be the only result of the suits, but they are instituted and conducted on the hypothesis that claims against the offending vessels are created by the collision.* The vessels are not arrested and taken into custody by the marshal, for the reasons of public policy already stated, and- for the further reason that it is to be presumed that the government will at'once satisfy a decree rendered by its own tribunals' in a case in which it has voluntarily appeared'.
It is true, that in case of damage committed by a public vessel a legal responsibility attaches to the actual wrongdoei’, the commanding officer of the offending sh'ip, and the injured party may seek redress against him; but this is not' inconsistent with the existence of a claim against the vessel itself.. In the case of The Athol, already referred to, -where the. liability of'the actual wrongdoer is asserted, damages against the vessel were pronounced after an, appearance on behalf of the crown had been given by the admiralty proctop.†
The inability to enforce the claim against the vessel is not inconsistent with its existence!
Seamen’s wages constitute preferred claims, under the’ maritime law, upon all vessels; yet they cannot be enforced against a vessel of the'nation, or a vessel employed in its service. • In a case before the Admiralty Court of Pennsylvania, in 1781, it was adjudged, on a plea to the jurisdiction, that, mariners enlisting on board a ship of war belonging to a Sovereign independent State coul'd not libel the ship for their -wages.
*157 ■In a case in the English Admiralty Court, a libel having been filed to enforce a claim for seamen’s wages against a packet ship employed in the service of the General Post Office, Sir William Scott declined to take jurisdiction until notice was given to the Post Office Department, and he was informed that po'objection was taken to the'proceeding.* The fact that the court took jurisdiction when the' exemption, . upon which the government could insist, was waived, shows that a claim against thes vessel existed, as only upon its existence could the libel in any event be sustained.
Even where claims are made liens upon prooerty by statute, they cannot be enforced-by direct suit, if the property subsequently vest in the government. Thus in Massaehü-' setts- the statutes provide, that any person to whom money is due for lab,or and materials furnished in the construction of a vessel in that commonwealth, shall have a lien upon her, which shall be preferred to all other liens^except mariners’ wages, and shall continue- until the debt is paid, unless lost-by, a failure to comply with certain specified conditions; yet ip a recent case, where a.vessel' subject to a lien of this character was transferred ¡to' the United States, it was held that the lien could not be enforced in the courts of that State. The decision was placed upon the general exemption of the government and its property from legal proeess.†
So also express contract liens upon the property of the United,States are incapable of enforcement, A mortgage 'upon property, the title to which had subsequently passed to the United States, would be in the same position- as a claim against a vessel of the' government, incapable of enforcement by legal, proceedings. The United States, possessing ‘ the fee, wolild be an indispensable party to any suit to foreclose the equity of redemption, or to- obtain á sale of the premises. In Lutwich v. The Attorney-General, a case cited by Lord Hardwieke in deciding Reeve v. Attorney-General,‡ a bill was "filed to foreclose a mortgage after- the mortgagor *158 had been attainted for high treason, and the court refused a foreclosure against the crown, but directed that the mortgagee should hold and enjoy the mortgaged premises until the crown thought proper to redeem the estate.
.In Hodge v. Attorney-General,* the deeds of certain leasehold estates had been deposited by one Bailey with the plaintiffs, who were bankers, to secure a balance of a running account between him and them. Bailey was afterwards convicted of felony, and the leasehold estates vested in the crown. At the time of his conviction-he was indebted to the plaintiffs, who filed a bill against, the attorney-general,' claiming tó be equitable mortgagees of the leasehold estates, to subject the property to sale, and the application of the proceeds' to the payment of the amount due them. But-the. court Said that the only decree which could be made in the case was t(V declare the plaintiffs to be equitable mortgagees of the property, to direct an account to.be taken, and that the.plaintiffs hold possession of the property until their lien was satisfied. “I do not think,” said Baron Alderson, in giving, the decision, “that I have any jurisdiction in this case to.order a sale. Here the legal estate is vested in the .crown; and I do not know any process by which this court can compel the crown to convey that, legal estate,”'
In this country, where, as a general rule, a mortgage is treated only as a hen or incumbrance, and the mortgagor retains possession of the premises, the relief granted in the two cases cited .wo'uld be of no avail.
. The authorities to which we have referred are sufficient to. show that the existence of a claim, and even of a lien upon próperty, is not always dependent upon the ability of the holder to enforce it by legal proceedings, A claim or lien existing" and continuing will be enforced by the courts whenever the property upon which .it lies becomes subject to their júrisdiction and control. Then the rights and interests of all parties will be respected'and maintained. Thus, if the government, having the title to land subject to the *159 mortgage of the previous owner, should transfer the prop erty, the jurisdiction of the court to'enforce the lien would at once attach, as it existed before the acquisition of the property by the government.
So if property belonging to the government, upon which claims exist, is sold upon judicial decree, and the proceeds are paid into the registry, the court would have jurisdiction to direct the claims to be satisfied out of them. ' Such decree of sale could only be mqde upon application of the government,' and by its appearance in court,- as we have already said, it waives its exemption and submits tO' the application of the same principles by which justice is adhiitiistered'between private suitors.
■ Now, it is a settled principle of admiralty law, that all maritime claims upon the yessel- extend equally to the proceeds, arising from its sale, and are .to be satisfied out of them. Assuming, therefore, that the Siren was in fault, and that by the tort she' committed a claim was created against her, we do not perceive any just ground for. refusing its satisfaction out of the proceeds-of her sale. The government. i§ the actor in thé suit for-her condemnation. It asks for hér sale, and the proeeeds.coming into the régistry of the court, come affected with all the claims which existed upon, the vessel created subsequent, to her capture. There is no authority, that we are aware of, which would exempt them under these circumstances, because of the exemption of the government from a direct proceeding in reni against the vessel whilst in its custody.
This-doctrine wa^ applied by this court in the case of the St. Jago de Cuba,* where a libel was filed by the'United States to forfeit the vessel for violation of the laws prohibiting the slave trade.- Claims of seamen for wages, and of material-men for supplies when the parties were ignorant of the illegal voyage of the vessel, were allowed -and paid out of the proceeds. These claims arose subsequent to the illegal acts which created the forfeiture, yet they were not *160 superseded by the claim of the government:' “In ease of-wreck and salvage,” said the .court, “it is unquestionable that the, forfeiture would be -superseded;, and we see no ground on which to preclude any other maritime claim . fairly and honestly acquired.” ' This language, though used with reference to claims arising out df contract, may be applied' to claims arising out of torts committed after the cápture of the offending'yessel.
In United States v. Wilder* it was held thát goods of the United, States- were subject to contribution equally -with goods of private shippers, to meet the expenses incurred in saving -them, which were averaged, a-nd that the owners of-the vessel could retain the goods; until their share of the con- ■ ttibutioh.to the average was paid or secured. The United States claimed the right to take the goods without paying or securing this shate; and this being denied, the action was brought to recover their value. In delivering the opinion, .Mr.1 Justice Story stated that he was .unable-to distinguish the case from1 one of salvage, and that it had never been doubted that in cases of salvage of priváte ships and cargoes, the. It eight bn board belonging to the government was equally Subject to the admiralty process-'ira rem for its proportion due for salvage with that of ¡mere private shippers;' but'that it' might be, for aught he knew, different in cases of the salvage of public, ships. “ Thelsame reasoning, however,” continued the learned justice, “which has been.applied oy the government against the lien for general average, applies with equal force against the lien for salvage1 of government property' under all circumstances.' Besides, it is by .no means true, that liens existing on particular things are displaced, by the government becoming’ or.succeeding to the proprietary interest. The lien of seamen’s wages and of bottom'ry bonds exists in all cases as much against the government, becoming proprietors by way of purchase, or forfeiture,-or otherwise; as it does against.tbe particular things in the possession of a private person.”
*161 In the case of The Schooner Davis and Cargo, recently decided in the Circuit Court of the United States for the Southern District of New' York, cotton belonging to the United States was held liable to contribution to meet the allowance made for salvage services in saving vessel and cargo. “ The mere fact,” said the court, “ of the ownership of the cotton by the government, in the act of being carried-to its port of- destination for -the purposes of a market as merchandise, we think did not exempt it from the lien in case of salvage service. We shall not enter into an argument in support of the position, as the subject, of rather a kindred one — the liability of property of the government for general'average — and, the present question incidentally have been already most.elaborately examined by Mr. Justice Story,.* We are'inelined, also, to the opinion, that it is the doctrine of the admiralty in England,† and. of the most approved modern elementary writers on the¡subject in'this country.”‡
There is no just foundation for the objection that claims for maritime torts cannot 'be dealt with and adjusted by a prize court. “It is a principle well settled, and constantly conceded and applied,” said Chancellor Kent,- “ that prize courts have exclusive jurisdiction and an enlarged discre-' tion as to the allowance of freight, damages, expenses, and costs in all cases of-captures, and as to all torts, and personal injuries, and ill-treatments, and abuse of power connected with captures jure belli; and. the courts will frequently award large and liberal damages in those cases.”§ The jurisdiction is not, therefore, limited to the determination of the simple question of prize or no prize. But whatever may be the limitation upon the jurisdiction of a prize court in Eugland, there is no such limitation upon the District Court sitting as a prize court in this country. Here, the District Court, as was said in United States v. Weed,ǁ “ holds both its. *162 prize jurisdiction and its jurisdiction as an instance court of 'admiralty from the Constitution and the acts of Congress, and is but one court with these different branches'of admiralty jurisdiction, as well as cognizance of other and distinct subjects.” It may, therefore, hear and determine all questions respecting claims arising after the capture of the vessel. Outstanding claims upon the vessel, existing previóus to the capture, cannot be considered; This exclusion rests not on the ground of any supposed inability of the court to pass upon these claims correctly, but because they are superseded by the .capture.*
As to the suggestion that a maritime tort, committed by á ship in possession of a prize master and crew, ought not to create a- plaim on the vessel against a neutral owner in ease the vessel is restored, it is .sufficient to say, although' .the vessel having been condemned tlie question is not of importance in this case, that the claim in that event, if held to exist, would not be the subject'of consideration by the prize court. Here, however, the title was divested from the previous owner by the capture, that being lawful, and vested in theUnited States (in trust as to one-half for the captors), although the legality of the capture was not established until the sentence of condemnation.
• It does hot appear that the court below considered the evidence as to the character and extent of the alleged tort. It appears to'have placed its decision' entirely upon the legal proposition, that the captured vessel was exempt from legal process 'at the' suit of the intervenors, and that consequently the proceeds'of the vessel could not be subjected to the satisfaction of their claims. "We have, however; looked into ■the evidence, and are satisfied that the collision was the fault of the Siren. It took place in tine daytime. The sloop was -seen from the steamer in time to avoid her. The steamer was out of the regular track for steamers passing through Hurlgate. The passage is noted for its difficulties and dan *163 gers, and, under the laws of New York,, pilots are specially commissioned to take vessels through it. The prize master ■ engaged a pilot for the Sound to take the steamer from New York to Boston, but refused to engage a Hurlgate pilot, his reason being to avoid expense. With such a pilot she would . have been- taken in the regular track of steamers northward of Blackwell’s Island, and so close to Flood Rock as to avoid the sloop, as might easily have been done. We do not think, it important to cite from1 the evidence in vindication of our conclusion, especially as it was not seriously contésted on the argument that the Siren was responsible for the collision.
The decree must be reversed, and the cause remanded to the' court below, with directions to assess the damages and pay them out of the proceeds of the vessel before distribution to the captors.
Ordered accordingly.

 8 Peters, 444.

 8 Ib. 150.

 7 Peters, 16.

 Coote’s New Admiralty Practice, 31.

 1 W. Robinson, 382.

 The Clara, 1 Swabey, 3; and the Swallow, Ib. 30.

 See, also, United States v. Brig Malek Adhel, 2 Howard, 233.

 The Lord Hobart, 2 Dodson, 103.

 Briggs and another v. Light Boats, 11 Allen, 157.

 2 Atkyns, 223.

 3 Younge & Collyer, 342.

 9 Wheaton, 409.

 3 Sumner, 308.

 3 Sumner, 368.

 3 Haggard, 246.

 1 Parsons’s Maritime Law, 324; 2 Ib. 625; Marvin on Wrecks and Salvage, § 122; see, also, 7 Wheaton, 283.

 1 Kent, 354.

 5 Wallace, 69.

 The Battle, 6 Wallace, 498; The Hampton, 5 Ib. 372; and The Frances, 8 Cranch, 418.