### THE CEYLON MARU.

### THE JEANETTE SKINNER.

(District Court, D. Maryland. June 21, 1920.)

1. **Shipping ☞3½, New, vol. 8A Key-No. Series—Liability in rem attaches to government ship.**

    A ship may be held liable for a collision, which occurred while she was owned by the government and operated by its employés for its public military purposes, if the court has jurisdiction.

2. **Shipping ☞3½, New, vol. 8A Key-No. Series—Court has jurisdiction of government owned ship in collision prior to use in merchant service.**

    Under Shipping Act, § 9 (Comp. St. § 8146e), a government owned ship in the merchant service, or a privately owned ship, is not immune from arrest by reason of a collision occurring while the ship was owned by the government and operated by its employés for its public military purposes; Act March 9, 1920, § 4, relieving private owner of any hardship.

3. **Shipping ☞3½, New, vol. 8A Key-No. Series—Statute waiving immunity from arrest of government owned ship not strictly construed.**

    While it is the duty of the courts to see to it that the operations of the sovereign shall not be hampered by the seizure of its property, nor shall it, without its consent, be subject directly or indirectly to suits, there is no reason why such legislation as Shipping Act, § 9 (Comp. St. § 8146e), waiving immunity of a government owned ship from arrest, should be narrowly construed; such statutes being remedial, and entitled to a fair and liberal interpretation.

4. **Collision ☞73—Incumbent on ship, colliding with anchored ship, to show cause of failure of steering gear to work.**

    Where there was a collision with an anchored ship, it was incumbent on the moving ship to show what was the cause of the failure of her steering gear to function, or what were all the possible causes, if there were more than one, and to prove that no precautions reasonably requirable of her would have prevented its or their operation.

5. **Collision ☞69—Anchored ship not required to figure out all possibilities suggested by unexpected movements of colliding vessel.**

    An anchored ship, not otherwise in fault, is not to be held blameworthy because those in charge of her do not instantly figure out all the possibilities which, upon calm reflection, might be suggested by unexpected movements of a vessel approachng them; unusual quickness of apprehension not being required, but the exercise of reasonable care and skill being sufficient.

6. **Collision ☞69—Anchored ship must hold place until doubt as to action of approaching vessel is cleared.**

    It was the business of an anchored vessel to hold its place, so long as there was any doubt as to what an approaching vessel might do.

7. **Collision ☞69—Anchored vessel not at fault for not letting out chain on approach of colliding vessel.**

    An anchored vessel *held* not at fault for failure instantly to pay out chain on the approach of a vessel whose steering gear would not work.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**8. Collision** ☞69—**Anchored vessel need not keep men standing by ready to pay out chain at moment's notice.**

An anchored vessel is not required to contemplate the probability of the steering gear of another ship failing to work, so as to cause a collision, and is not required in broad daylight, as well as at night, or in a thick fog, and at all times, in calm as well as in stormy weather, to keep officers and men standing by ready to pay out chain at a moment's notice.

In Admiralty. Suit by the Nippon Yusen Kabushiki Kaisha, owner of the Japanese steamship Ceylon Maru, against the steamship Jeanette Skinner. Decree for the former.

Burlingham, Veeder, Masten & Fearey, of New York City, and George Weems Williams, of Baltimore, Md , for libelant.

Samuel K. Dennis, of Baltimore, Md., for respondent.

ROSE, District Judge. On the 2d of November, 1918, there was a collision between the American steamship Jeanette Skinner and the Japanese steamship Ceylon Maru. For brevity they will be called the Skinner and the Ceylon. The Skinner was then a Shipping Board ship, and still is. She was in charge of a naval crew, and for some months preceding the day named she had been in government service, engaged in transporting military supplies to the army in France. When she struck the Ceylon, she was homeward bound in ballast. Upon her arrival in this country she went into dry dock, and, the Armistice having intervened, she was, on coming out, assigned to carry food products to Europe for account of the Swiss government. While so employed, she was arrested in this case.

For reasons stated in an opinion heretofore filed (The Jeanette Skinner [D. C.] 258 Fed. 768), it was held that at the time she was seized by the marshal she was solely employed as a merchant vessel, and that under the authority of The Lake Monroe, 250 U. S. 246, 39 Sup. Ct. 460, 63 L. Ed. 962, she was not immune from ordinary process upon a libel in rem against her. The question was then reserved as to whether she could be held liable for a collision which occurred while she was owned by the government and operated by its employés for its public military purposes.

[1] On her behalf it is now argued that no liability in rem ever attaches to a ship belonging to the government for anything she does while in its public service. What Chief Justice Waite said, while on circuit, in The Fidelity, 8 Fed. Cas. 1189, No. 4,758, fully sustains this contention. But the Supreme Court in Workman v. New York City, 179 U. S. 552, 21 Sup. Ct. 212, 45 L. Ed. 314, explained that what was decided in that case was merely the application of the exception to the mode of execution of a judgment or decree against a municipal corporation, and then went on to say that in the admiralty law the existence of that exception in all cases had been denied, citing a case from this district. Oyster Police Steamers of Md. (D. C.) 31 Fed. 763. It expressly declined to pass upon which of the conflicting conclusions on this point was the correct one. The Siren was cited (7 Wall. 153, 19 L. Ed. 129), and the English cases analyzed, and it was

then declared that the English law, in harmony with the maritime law of this country, held that the fact that the wrong had been committed by a public vessel of the crown afforded no ground for contending that no liability arose because of the public nature of the ship, although it may be, in consequence of a want of jurisdiction over the sovereign, redress cannot be given. It said that the public nature of the service upon which the vessel was engaged at the time of the commission of a maritime tort affords no immunity from liability in a court of admiralty, when the court has jurisdiction. In The Siren, supra, the libel was in rem.

The language of the Supreme Court is so clear that it does not seem that it is open to two constructions, and such clearly was the opinion of the judges who sat in The Florence H. (D. C.) 248 Fed. 1012, The Gloria, 267 Fed. 929, Samuelson v. The F. J. Luckenbach, 267 Fed. 931 (both of the last-mentioned cases having been decided in the Southern district of New York), and The City of Philadelphia (D. C.) 263 Fed. 234.

[2] On behalf of the Skinner the further contention is made that, were it not for section 9 of the Shipping Act of 1916 (Comp. St. § 8146e), it would not be possible to enforce any lien against her in rem while she remained, as she still is, government property. It is said that the immunity there waived is limited to causes of action wh.ch arose while she was employed as a merchant ship. It is argued that the principal reason why the section in question subjected government owned ships, while operated for mercantile purposes, to the laws, regulations, and liabilities governing merchant vessels, was to protect privately owned craft from unfair competition. That is doubtless true, yet The Siren, supra, and Workman v. New York City, supra, hold that the liability was incurred when the tort was committed, even although the ship was then immune from arrest, and that but for such immunity it was enforceable against her. Now section 9 expressly subjects government owned ships, when they are operated as merchantmen, to the laws governing merchant ships, and those laws, as interpreted in The Lake Monroe, supra, and other cases, include liability to admiralty process, so that, a maritime lien in rem existing, and the only objection to its enforcement having been government ownership, and the law having provided that that immunity shall no longer exist when the ship is used as a merchant vessel, it would seem to follow that she must now answer for a tort alleged to have been committed by her while engaged in army service.

[3] A good deal is said, both in The Fidelity, supra, and in the brief of the government proctors in this case, as to the difficulties which may arise if a public ship of the United States be sold to private individuals, and while in the possession of the latter proceedings are taken to subject her to liabilities incurred while she was government owned. Provision seems to have been made for such cases by section 4 of the Act of March 9, 1920, which provides that if a privately owned vessel, not in possession of the United States, is arrested or attached upon any cause of action arising from previous possession, ownership, or operation of such vessel by the United States, it shall be released without

bond or stipulation, upon the suggestion by the United States that it is interested in such cause, desires such release, and assumes liability for the satisfaction of any decree. While it is the duty of the courts to see to it that the operations of the sovereign shall not be hampered by the seizure of its property, nor shall it, without its consent, be subject directly or indirectly, to suits, there is no reason why such legislation as that found in section 9 of the Shipping Act of 1916 shall be narrowly construed. Such statutes are remedial, and are entitled to a fair liberality of interpretation.

It must be held that, if the Skinner was to blame for the collision, in whole or in part, she must answer in these proceedings. Attention must therefore be directed to the circumstances of the mishap.

In October and November, 1918, the Ceylon was under charter to the Quartermaster's Department of the United States Army. On October 15th, while at Bordeaux, influenza having broken out on board, she was ordered to drop down the stream, and on the latter day she anchored in the Gironde river, about a mile and a half off Trompelcupe, paying out 45 fathoms of chain. There she remained until after the collision. At 6 a. m. on November 2 the Skinner, after delivering a cargo of war material, left Bordeaux in ballast on her return voyage to this country. A few minutes after 8 on the same morning she ran into the Ceylon, seriously damaging both ships.

The Skinner's story is that she was coming down the center of the channel, moving over the ground at from 9 to 10 knots an hour; to avoid the Ceylon, she tried to make a slight change in course, but found that her steering gear would not work, and although her engines were reversed, and her anchor dropped, she could not be stopped in time to keep her from striking the other ship.

The Skinner was equipped with a Lidgerwood hydraulic telemotor steering system. She says it was in perfect order when she left the United States for France; that it worked satisfactorily all the way over; that it was overhauled at Bordeaux, some new washers being supplied, and was put in good condition; that during the two hours which elapsed between her departure from Bordeaux and her getting close to the Ceylon it promptly responded to every demand made upon it; that immediately after the collision it was again inspected, and nothing was found wrong with it; and that on her subsequent westward voyage over the Atlantic to this country it gave entire satisfaction, as it has ever since.

The Ceylon produced a witness thoroughly familiar with the construction of the Lidgerwood system. He says that at times the wheel and rudder may not conform, but, when this happens, they can, within 15 seconds, be brought into perfect adjustment by the simple expedient of putting the wheel into a midship position, conforming to that of the rudder.

It may very well be that those on the Skinner's bridge did not know what to do under such circumstances, either because they had never been told, or because, when the first trouble occurred, they became excited, as the evidence shows some of them certainly did, and in consequence lost their heads. Other more serious things may, of course,

have happened to the system; but, if they had, they would not have righted themselves as in the Skinner's case, if they ever existed at all, the testimony shows they must have done.

The officer at the time on her bridge, and in charge of her navigation, had the rank of "reserve ensign" in the navy, but his prior nautical experience in a responsible position had been very limited. His evidence, as it appears in the deposition filed herein, does not give an impression of any great competency. Nobody on the bridge, except the pilot, knew anything of French. His English was limited to "port" and "starboard," and a few such phrases. The brief for the Skinner says that, when the steering apparatus failed to work, he became so wild in his actions that his excitement should have been noticed, even on the Ceylon. The ensign in command, in his haste to sound the danger signal, broke the bell cord. According to his testimony, it may have been chafed, but it was wire.

[4] It was incumbent upon the Skinner to show what was the cause of the failure of the steering gear to function, or what were all the possible causes, if there were more than one, and then to prove that no precautions reasonably requirable of her would have prevented its or their operation. No explanation of what was wrong with the steering gear has been attempted, and because we do not know what was wrong with it, if anything was, we do not know that with care all trouble might not have been avoided. The Merchant Prince, [1892] L. R. Probate Division, 188; In re Reichert Towing Line, 251 Fed. 214, 163 C. C. A. 370; The J. Rich Steers, 228 Fed. 319, 142 C. C. A. 611. The Skinner has failed to make out a case of inevitable accident, even if she had promptly done all that she should after the discovery that her steering apparatus was out of order. In point of fact, however, nothing was done for a considerable period after both ensign and pilot knew the ship was out of hand.

The ensign in charge himself testified that, according to the record he claims to have made at the time, he did not order the Skinner's engines reversed until two minutes after she had failed to respond to the wheel, and, when he gave the order, it was then, as he recognized, too late to prevent the collision by anything that could be done on his ship. Another witness for the Skinner makes this interval three times as long, and its chief engineer says he was inspecting the packing of the stern gland, and that the collision took place just when the engines started to reverse. The anchor was not dropped until after the order had been given to put the engines hard astern, but then her headway could not be checked, and her stem cut through the side of the Ceylon at a point about 10 feet abaft the latter's bow, and went 5 or 6 feet into the hold. The fault of the Skinner is manifest.

It is said that, even so, the Ceylon was also to blame. It is suggested that she was anchored at an improper place. She had been in the precise spot for 18 days, while many ships, including the Skinner, inbound and outbound alike, had safely passed her without, so far as appears, any of them having in the slightest degree been incommoded, or without anybody making a complaint.

The witnesses from the Ceylon say there was a quarter of a mile of

water on one side, and three-quarters of a mile on the other. Those from the Skinner were subsequently examined. They do not specifically contradict this assertion, contenting themselves in saying in general terms that the river was there narrow, but refraining from giving any precise figures as to its width.

The conclusive answer to all contentions that the Ceylon was in a place which made her a danger to other ships is given by the fact that the master of the Skinner, after he saw the Ceylon, left the bridge and went to his own room. He obviously did not think her presence confronted his ship with any difficult problem of navigation.

The contention is, however, very earnestly made that the Ceylon could have avoided the collision by paying out more anchor chain, that she had time enough to do so after she saw that the Skinner was out of control, and that she is answerable for not doing it. As the Skinner struck the Ceylon only 10 feet abaft her stem, it is of course true that, had the Ceylon dropped back 40 or 50 feet, there would have been no collision. It is equally established that a strong ebb tide was running at the time, which would have rapidly carried her back, had her cable permitted.

[5-7] The testimony from the Ceylon impressed me very favorably. There was no attempt on the part of the witnesses from it to minimize the distance the Skinner was from them at the time she did the various things testified to. The fact that she blew three whistles to indicate that she was backing cannot be fairly said to have constituted any warning to them. Danger signals might have. They were not sounded, because, as already mentioned, the whistle cord broke. The dropping of the anchor, which followed, might have seemed to them to show that she had reversed her engines to facilitate her being brought up by her anchor; that is to say, they may have supposed that for some reason of her own she wanted to stop.

It is strongly urged in the brief of the learned proctors for the Skinner that, if this had been her purpose, she would have first turned around and headed to the strong tide which was running. Even so, a ship not otherwise in fault is not to be held blameworthy because those in charge of her do not instantly figure out all the possibilities which upon calm reflection might be suggested by the unexpected movements of a vessel approaching them. Men are not to be held liable for not possessing unusual quickness of apprehension. All that can be required is the exercise of reasonable care and skill. It was not until those on the Ceylon understood, or should have understood by the exercise of those attributes common to skillful and prudent seamen, that the Skinner was out of control, that there was any occasion for changing its position in the slightest. As an anchored vessel, it was the business of the Ceylon to hold its place so long as there was any doubt as to what the Skinner might do, and it was not until the latter was noticed dragging her anchor that the first officer of the Ceylon, then on its bridge deck, felt called on to act. I do not think that he is chargeable with not having divined earlier so unusual a condition of things. He then rapidly started to go from the bridge to the

266 F.—26

well deck to pay out chain, but before he could get there the collision took place.

[8] The suggestion that the Ceylon was required to contemplate the probability of something of this kind happening in broad daylight, as well as at night, or in a thick fog, and at all times, in calm as well as in stormy weather, to keep officers and men standing by, ready to pay out chain at a moment's notice, may be dismissed as exacting a standard of vigilance for which there is no warrant. Before it can be required, there must be notice of some conditions out of the ordinary, which make such a precaution one that an ordinarily skillful and prudent mariner would take. The cases relied on by the Skinner do not, it is believed, lay down any more exacting rule, although under the facts of some of them the anchored ship was properly held liable for failure promptly to pay out chain.

It follows that the Skinner must be held solely to blame. A decree in accordance with the conclusions herein set forth may be presented for signature.