**INTERNATIONAL AIRCRAFT RECOVERY, L.L.C. a Nevada Limited Liability Company, Plaintiff,**

v.

**THE UNIDENTIFIED, WRECKED AND ABANDONED AIRCRAFT, her armament, apparel, and cargo located within one (1) marine league of a point located at 2543′4″ N Latitude and 802′8″ W Longitude, Defendant.**

and

**United States of America, Intervenor,**

No. 98–1637–Civ.

United States District Court,
S.D. Florida.

July 8, 1999.

[redacted]

David Paul Horan, Key West, FL, for plaintiff.

Tierney Carlos, U.S. Department of Justice, Washington, DC, for defendant.

## OPINION

JAMES LAWRENCE KING, District Judge.

This case arises on cross motions for summary judgment, as an *In Rem* admiralty action involving the salvage of an extremely rare and historic aircraft that crashed in waters beyond the territorial limits of the United States 56 years ago last week, on July 1st, 1943. Intervenor United States of America asserts that the United States Navy is the owner of the *In Rem* Defendant aircraft and disputes *In Rem* jurisdiction over the Defendant property. The Plaintiff/Salvor claims rights and/or ownership of the *In Rem* Defendant aircraft in admiralty, asserting the "Law of Finds" and, alternatively, the "Law of Salvage". Plaintiff has taken possession of the *In Rem* Defendant aircraft that has been lost and abandoned for over a half century. Further, Plaintiff asserts that the *In Rem* Defendant aircraft was, and is, in a condition of maritime peril. The Intervenor, United States, defends on the issue that the *In Rem* Defendant aircraft has never been lost, abandoned, or in maritime peril.

The evidence before the Court consists of: Plaintiff's Verified Complaint, the June 23rd, 1998 Affidavit and May 25th, 1999 deposition of Douglas Champlin, President of Historic Aircraft Recovery, Inc., a Nevada corporation (the Managing Member of the Plaintiff International Aircraft Recovery, L.L.C., a Limited Liability Company); the February 9th, 1999 Affidavit and April 22nd, 1999 deposition of Dr. William S. Dudley, the Director of Naval History and Director of the Naval Historical Center in Washington, D.C.; the February 12th, 1999 Affidavit and May 24, 1999 deposition of Captain Robert L. Rasmussen, the Director of the National Museum of Naval Aviation in Pensacola, Florida; the May 24th, 1999 deposition of Robert "Buddy" Macon, the Deputy Director and Curator of the National Museum of Naval Aviation; and the testimony of the witnesses and exhibits from the June 4th, 1999 hearing. Final legal argument of counsel, on the cross motions for final summary judgment were head June 14, 1999.

The Court has viewed all of the evidence in a light most favorable to the Intervenor United States. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In ruling for the Plaintiff, the Court has resolved all reasonable doubts about the facts in favor of the Intervenor and has drawn all justifiable inferences in the Intervenor's favor. *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11 Cir. 1991). The Court finds that no material fact remains in dispute, and that the Plaintiff International Aircraft Recovery, LLC, is entitled to Summary Final Judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### *HISTORICAL INTRODUCTION*

On April 14th, 1938, the Douglas Aircraft Company delivered TBD–1, Bureau of Naval Operations No. (Buno # ) 0353 to the United States Navy. It was accepted by the Naval Air Station in Pensacola, Florida sixty-one (61) years ago, on May 3rd, 1938. From 1938 until mid–1941,

Buno # 0353 was on "Neutrality Patrol" in the central Atlantic. In July, 1941, with a prospect of the United States entering the World War becoming more and more certain, the aircraft was assigned to Torpedo Squadron Five, aboard the Aircraft Carrier "Yorktown" operating in the Pacific theater. During the next two (2) years, TBD–1 Buno # 0353 (along with other TBD-squadrons) was instrumental in turning the tide of war against the Japanese in both the "Battle of Midway" and the "Battle of the Coral Sea".

TBD–1 Buno # 0353 survived its involvement in these historic battles. During the "Battle of Midway", one TBD Squadron (VT–8) was entirely destroyed and another decimated when intercepted by Japanese Zero fighters. On the 7th and 8th of May, 1942, the Buno # 0353 participated in the "Battle of the Coral Sea". On May 7th, the TBD–1's and dive-bombers from the "Yorktown", attacked and sank the Japanese Aircraft Carrier, "Shoho". On May 8th, they attacked and heavily damaged the Japanese Aircraft Carrier "Shokaku". On these flights, TBD–1 Buno # 0353 was piloted by Ensign Francis R. Sanborn. On May 8th, while engaged in the attack on the Japanese Fleet, the "Yorktown" and the United States Aircraft Carrier "Lexington", were attacked by Japanese aircraft. The "Lexington" was damaged so badly she was later sunk to avoid capture. The "Yorktown's" repair parties controlled her damage sufficiently to enable her to recover many of her aircraft. TBD–1 Buno # 0353 was one of the planes that returned safely to Yorktown.

The aircraft returned for overhaul to Naval Air Station San Diego, from July until September, 1942 and then was assigned to the Atlantic Training Squadron at the Naval Air Station in Miami, Florida.

Ensign Bruce T. Mallory, while conducting a torpedo attack instruction flight on July 1, 1943, in the subject TBD–1, commenced having mechanical difficulties. During the flight, the aircraft's variable-pitch propeller malfunctioned and the aircraft was unable to sustain flight. Ensign Mallory crash landed the aircraft into the Atlantic Ocean in deep international waters, approximately eight (8) miles east of Miami Beach, Florida, where he and his crew escaped without injury.

On or about September 8th, 1943, the Naval Aircraft Records for TBD–1 Buno # 0353 were stamped, in two places, with the word "Stricken". On July 24th, 1944, the Chief of Naval Operations sent an "Aviation Circular" to all ships, stations and units concerned with Naval Aircraft. The subject was "Aircraft—Striking and Disposition of." The Aviation Circular was signed by Admiral John S. McCain, the Deputy Chief of Naval Operations (Air). Admiral McCain's directive fifty-five years ago, was non-discretionary in its recommendation that all crashed aircraft be stricken. The Admiral also ordered the striking of any aircraft that had completed its service life and directed that salvage begin on those aircraft. Provision was made for determining whether aircraft unable to return to the U.S. should be declared stricken. The availability of replacement aircraft and an evaluation of the condition of the individual aircraft were to be considered in making this determination. Once stricken, salvage operations were to begin for these aircraft as well, pursuant to Admiral McCain's orders.

All TBD–1's known to exist were stricken, destroyed or lost by the Navy at some time following the Second World War. The location of TBD–1 Buno # 0353 was lost for nearly half a century, "Stricken" from the Naval records.

In 1990, a group of salvors searching for Spanish galleons, located the wrecksite of a TBD–1. Using a remote operated vehicle (ROV), a videotape was produced showing the condition of the aircraft after years of exposure to a saltwater (highly corrosive) environment. After determining that the aircraft they had discovered in deep waters beyond the territorial limits of the

United States was (at that time) the only TBD-1 known to exist, the salvors attempted to sell the video tape and location of the rare aircraft to the National Museum of Naval Aviation (NMNA) in Pensacola, Florida, for the sum of $25,000.00. Since the NMNA had no budget for such acquisition, the purchase was refused.

Within a few months, Douglas Champlin, a collector of fighter aircraft from around the world and owner of "Fighter Aces Museum" in Mesa, Arizona, purchased the location of the TBD-1 and video tape for the sum of $75,000.00 Dollars. Mr. Champlin researched the location and history of the aircraft and discovered Buno # 0353's historic past. For several years, Douglas Champlin offered to enter into an agreement with the National Museum of Naval Aviation whereby Mr. Champlin would recover the TBD-1 in return for the trade of one or more surplus government owned fighter aircraft. Since purchasing the location and 1990 video, Douglas Champlin has conducted two salvage expeditions to the wrecksite of the *In Rem* Defendant aircraft. The first salvage expedition in December, 1994, was undertaken after discussions with Robert Macon, the NMNA Deputy Director. During this salvage expedition, a portion of the canopy of the TBD-1 Buno # 0353 was recovered and an additional videotape confirming the condition of the aircraft was made. This video confirmed that during the past five (5) years, the engine of the aircraft had dislocated from the frame and had started falling forward. In 1998, there was another salvage expedition, which produced another videotape, and the radio mast of the TBD was recovered. These salvage expeditions to the wrecksite provided information that was used by Douglas Champlin and his contractor, Robert Mester, to design and build a special cradle for the safe recovery of the aircraft. To date the Plaintiff International Aircraft Recovery and its predecessors in interest (Mr. Champlin) have invested over $130,000.00 in the salvage of the *In Rem* Defendant aircraft.

No other official action was taken by the United States Navy regarding TBD-1 Buno # 0353 until August 27, 1998. On that date, pursuant to a request from the National Museum of Naval Aviation (NMNA), the Commander of Naval Inventory Control Point entered an "Assignment" purporting to assign TBD-1 Buno # 0353 to the National Museum of Naval Aviation "for salvage and eventual static display". This assignment occurred after Plaintiff in this case filed an *In Rem* salvage complaint in United States District Court for the Southern District of Florida.

Dr. Dudley, the Director of the Naval Historical Center, Washington, D.C., Captain Rasmussen and Mr. Robert Macon, the Director and Assistant Director of the National Museum of Naval Aviation at Pensacola, Florida, all testified that there is no budget or any funding for locating and recovering historic aircraft from a water environment. These experts are unanimous in their opinion that TBD-1 Buno # 0353, located in deep international waters east of Miami Beach, Florida is one of the rarest and most historic military aircraft still in existence.

## PROCEDURAL HISTORY OF THE CASE

This case is the second time TBD-1 Buno # 0353 has appeared before this Court as an *In Rem* Defendant. In 1994, the Assistant Director of the National Museum of Naval Aviation, Robert Macon, conferred with Douglas Champlin and Champlin's agent, Robert Mester, with regard to providing some protection from damage to the plane or the wrecksite of the aircraft from third parties. Macon, Champlin and Mester also conferred regarding the recovery of a piece of the aircraft to ascertain its condition as it related to the aircraft's recovery and restoration.

In August of 1994 Douglas Champlin as President of Windward Aviation, Inc., an Oklahoma corporation d/b/a Champlin

Fighter Museum filed an *In Rem* action in this Court under Case No. 94–1775–Civ–Ungaro–Benages. Soon thereafter, a salvage expedition was mobilized to recover a portion of the TBD and to take additional video of the wrecksite for purpose of the final planning of the recovery and restoration of the *In Rem* Defendant aircraft. On February 14th, 1995, an Amended Complaint was filed in the *Windward Aviation* action, clarifying that Plaintiff's salvage action had been filed to *protect* the TBD against third parties and that it was Mr. Champlin's intent that the *In Rem* Defendant aircraft, when recovered, would be placed in the National Museum of Naval Aviation in Pensacola, Florida.

On March 2nd, 1995, the *Windward Aviation In Rem* action was dismissed and the portion of the canopy recovered by Mr. Champlin in 1995 was delivered to the NMNA in Pensacola, Florida.

Three and a half years after the dismissal of the *Windward Aviation In Rem* action, the present *In Rem* action was filed. The Verified Complaint was accompanied by Mr. Champlin's Affidavit in Support of the request that the Plaintiff/Salvor be appointed as this Court's Substitute Custodian for the *In Rem* Defendant aircraft. On July 21st, 1998, the Court entered its Order Appointing the Plaintiff/Salvor International Aircraft Recovery, LLC as the Court's Substitute Custodian. On November 2nd, a copy of a videotape of the 1998 salvage expedition to the wrecksite was sent to the Court as part of a Salvage Report. Because the Court's Order directing the issuance of the Warrant for Arrest *In Rem* had expired under the Local Rules, the Plaintiff/Salvor/Substitute Custodian filed a December 24th, 1998 Motion to Renew the *In Rem* Warrant. On December 30th, 1998, the United States moved to Intervene, to vacate the prior Court Orders pertaining to the *In Rem* arrest, to enjoin the Plaintiff from further salvage operations and for an Order requiring the return of any salvaged parts of the *In Rem* Defendant to the United States.

On January 26th, 1998, the Court entered its Order Renewing the Warrant of Arrest *In Rem* and on February 7th, 1999, the Plaintiff International Aircraft Recovery stipulated to the United State's intervention, responded to the Intervenor's Motions and defenses, answered the Intervenor's Counter–Claim and moved for Summary Judgment. On February 12th, the Intervenor United States replied to the Plaintiff International Aircraft Recovery, LLC's Motion for Summary Judgment and the Intervenor filed a Cross–Motion for Summary Judgment. On February 25th, 1999, the radio mast of the *In Rem* Defendant aircraft (recovered during the 1998 salvage expedition) was processed under the Court's *In Rem* Arrest Warrant and the United States Marshal's Property Return was filed with the Court.

Immediately upon the return of the *In Rem* Warrant, the Intervenor filed a document entitled, "Claim of the United States as Owner of the Defendant Aircraft and Contents". On March 4th, 1999, the Court entered an Order setting pretrial conference for June 4th, 1999 and trial on June 24th, 1999. March 16th, the Plaintiff/Salvor filed its "Notice of Action *In Rem* and Arrest of Vessel" and response to the Intervenor's Cross–Motion for Summary Judgment.

April 29th, 1999, the Intervenor filed a Motion for a Temporary Restraining Order and/or Preliminary Injunction and a Motion for Emergency Hearing. Due to a stipulation between the parties that no salvage expedition would be mobilized prior to the June 4th, 1999 pretrial conference, a hearing on all pending Motions was set for that time.

As of the June 4th, 1999 hearing on all pending Motions, the procedural status of the case was very similar to the July 1981 procedural status of the case in *Cobb Coin Company, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel,*

525 F.Supp. 186 (S.D.Fla.1981).[1] In that case, on July 7th, 1981, after an emergency hearing involving a counterclaim by the State of Florida requesting that it be declared the owner of the vessel and requesting an Order requiring the return to the State of the items salvaged by the Plaintiff, the Court entered an extensive Temporary Restraining Order and later a Preliminary Injunction. *Cobb Coin*, 525 F.Supp. at 190.

In these proceedings, as in *Cobb Coin*, the Court is fully cognizant of the Intervenor's legitimate interests in the preservation of what it considers to be a historical/archaeological treasure belonging to the United States. In *Cobb Coin*, and in these proceedings, the Court set the case for an immediate final hearing. In so doing, the Court followed the procedure established by the Fifth Circuit Court of Appeals in *Treasure Salvors v. The Unidentified Wrecked and Abandoned Sailing Vessel*, 640 F.2d 560 (5 Cir.1981). As to the claim of the United States in *Treasure Salvors*, and in these proceedings, there is no dispute as to any of the material facts that support this Summary Final Judgment.

### THE THRESHOLD DETERMINATION: THE BASIS OF JURISDICTION

Intervenor, United States of America, questions the Court's admiralty jurisdiction and raises issues of whether the *In Rem* Defendant aircraft was "abandoned" property or became a "derelict". The Court's analysis of whether the aircraft was abandoned appears later in this Opinion.

■ The legal basis of the Court's exclusive jurisdiction is Article III, Section 2, Clause 1 of the United States Constitution, testing judicial power of Federal Courts ... "to all cases of admiralty and maritime jurisdiction." The salvage of items from navigable waters, both within and without the United States, constitutes the core of the exclusive admiralty and maritime jurisdiction of United States District Courts. In *Houseman v. O'Hara*, 40 U.S. 40, 15 Pet. 40, 10 L.Ed. 653 (1841), the United States Supreme Court held, "The admiralty court is the only court where such a question [of salvage] can be tried; for what other court, but a court of admiralty has jurisdiction to try a case of salvage?" *Id.* at 48.

During the last twenty years, the United States Supreme Court has decided two cases involving *In Rem* salvage actions: *Florida Department of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982); and *California v. Deep Sea Research*, 523 U.S. 491, 118 S.Ct. 1464, 149 L.Ed.2d 626 (1998). *Treasure Salvors* produced three Opinions with the plurality holding that the salvor owned the salvage and was entitled to continue salvage, but that the admiralty courts did not have the power to adjudicate the State's interest in salvaged property without the State's consent. 458 U.S. at 711, 102 S.Ct. 3304. *Deep Sea Research* was a *unanimous* Opinion of all nine Justices. The Court revisited its decision in *Treasure Salvors* and clarified jurisdiction of Article III Courts in *In Rem* salvage actions. Justice O'Conner, writing for a unanimous court, pointed out that *Deep Sea Research* was a decision determining the federal court's *In Rem* jurisdiction where an official of the state, the federal government or a foreign government appears in an *In Rem* action and asserts ownership of the res (118 S.Ct. at 1472) and said: "It is true that statements in the fractured Opinions in *Treasure Salvors* might be read to suggest that a federal court may not undertake *In Rem* adjudication of the state's interest in property without the state's consent, regardless of the status of the res."

---

1. Coincidentally, a case with which this Judge is very familiar since he was also the presiding judge and author of the opinion of *Cobb Coin* in 1981.

The opinion went on to hold that all cases involving claims by the state, the federal government or a foreign government, involving the *In Rem* Defendant in a salvage action will be determined on the basis of whether the intervening sovereign was making a claim that the res was in it's *actual possession*, drawing on two earlier decisions of the Supreme Court, *"The Siren"* and *"The Davis"*. In *The Siren*, 7 Wall. 152, 74 U.S. 152, 159, 19 L.Ed. 129 (1868), the Court held that if a vessel was in the actual possession of the United States, it would be exempt from a direct *In Rem* proceeding. A year later, in *The Davis*, 10 Wall. 15, 77 U.S. 15, 19 L.Ed. 875 (1869), the Supreme Court held that where property of the United States was involved, the only time an *In Rem* proceeding would be forbidden would be in a situation where the actual ... "possession of the United States must be invaded under process of the Court." *Id.* 77 U.S. at 20. In *"The Davis"* and in last year's unanimous Opinion in *Deep Sea Research*, the Court held that the "possession" requirement was ... "an actual possession, and not the mere constructive possession which is very often implied by reason of ownership under circumstances favorable to such implication." *"The Davis"*, 77 U.S. at 21. *Deep Sea Research*, 118 S.Ct. at 1473.

Justice O'Conner, in explaining the exclusive *In Rem* jurisdiction of the Federal Admiralty Courts, quoted two decisions in 1809 by Justices Story and Washington for the proposition that ... "In cases of admiralty and maritime jurisdiction, the property in dispute is generally in the possession of the Court, or of persons bound to produce it, or its equivalent, and the proceedings are *In Rem*. The Court decides in whom the right is, and distributes the proceeds accordingly." *Deep Sea Research*, 118 S.Ct. at 1470.

There were four (4) "concurring" Opinions to Justice O'Conner's unanimous Opinion in *Deep Sea Research*. Justice Stevens, who had written the plurality Opinion in *Treasure Salvors* explained the mistake made by both the four (4) members of the plurality and the four (4) dissenters in *Treasure Salvors*. Justice Stevens, in his concurring Opinion stated, "I believe that both Opinions [plurality and dissent] made the mistake of assuming that the Eleventh Amendment has the same application to an *In Rem* admiralty action as to any other action seeking possession of property in the control of state officers." *Deep Sea Research*, 118 S.Ct. at 1474. He concluded by stating, "Having given further consideration to the special characteristics of *In Rem* admiralty actions, and more particularly to the statements by Justice Story and Justice Washington quoted at pages 9 and 10 of the Court's Opinion, I am now convinced that we should have affirmed the *Treasure Salvors'* judgment in its entirety." *Id.* at 1474. Justices Kennedy, Ginsberg and Breyer also entered concurring Opinions in *Deep Sea Research* indicating that ... "It ought to be evident" ... that the issue of a Federal Court's *In Rem* jurisdiction even over an *In Rem* Defendant *in the state's possession* is "open to reconsideration". *Id.* at 1474.

 Based upon last year's Supreme Court decision governing all *In Rem* admiralty actions involving *In Rem* Defendants in which an official of a state, the federal government or foreign government asserts ownership, without actual possession, this Court now holds that the salvage services advanced by the Plaintiff/Salvor International Aircraft Recovery, LLC., and its predecessors in interest, constitute a valid maritime lien against the *In Rem* Defendant. The Intervenor United States admits that it is not in possession or control of the *In Rem* Defendant.

This Court holds that the Plaintiff's federal salvage rights and remedies are in full force and effect and that the Plaintiff has been, and is, ably engaged in successfully returning to the people of this country, a historic aircraft which otherwise would remain lost beneath the sea.

## ABANDONMENT

Justice O'Conner, speaking for a unanimous United States Supreme Court in *California v. Deep Sea Research,* 523 U.S. 491, 118 S.Ct. 1464, 149 L.Ed.2d 626, quoting the Court of Appeals for the Ninth Circuit said:

"As to the specifics of the State's claim under the ASA, the court held that the District Court did not err in concluding that the State failed to prove that the *Brother Jonathan* is abandoned within the meaning of the statute. The court reasoned that, in the absence of a definition of abandonment in the ASA, 'Congress presumably intended that courts apply the definition of abandonment that has evolved under maritime law.' *Ibid.* In maritime law, the court explained, abandonment occurs either when title to a vessel has been affirmatively renounced or when circumstances give rise to an inference of abandonment."

Further, at p. 389 of the opinion, she said:

"There remains the issue whether the courts below properly concluded that the *Brother Jonathan* was not abandoned for purposes of the ASA. That conclusion was necessarily influenced by the assumption that the Eleventh Amendment was relevant to the courts' inquiry. The Court of Appeals' determination that the wreck and its contents are not abandoned for purposes of the ASA was affected by concerns that if 'the vessel had been partially abandoned, both the federal court and the state court would be adjudicating the fate of the *Brother Jonathan*.' 102 F.3d, at 389. Moreover, the District Court's inquiry was a preliminary one, based on the concern that it was premature 'for the court to find that any individual items of cargo or personal property have been abandoned.' 883 F.Supp., at 1354. In light

of our ruling that the Eleventh Amendment does not bar complete adjudication of the competing claims to the *Brother Jonathan* in federal court, the application of the ASA must be reevaluated. Because the record before this Court is limited to the preliminary issues before the District Court, we decline to resolve whether the *Brother Jonathan* is abandoned within the meaning of the ASA. We leave that issue for reconsideration on remand, with the clarification that the meaning of 'abandoned' under the ASA conforms with its meaning under admiralty law." [2]

Abandonment under admiralty law has been construed by the Supreme Court on a number of occasions. In *Cromwell v. Bark Island City,* 66 U.S. 121, 1 Black 121, 17 L.Ed. 70 (1861), the Court held that a vessel was abandoned if those in charge had departed without hope of, or intent to, return to her. The Court held that such a vessel was termed a "derelict" and that voluntary salvors were entitled to salvage compensation if they were successful, in whole or in part, in saving the imperiled vessel. In *"The Laura",* 14 Wall. 336, 81 U.S. 336, 20 L.Ed. 813 (1871), the Court held that where a vessel was in danger of being lost so far as any timely effort to save her was contemplated, the vessel was open to a voluntary salvor acting in good faith with reasonable judgment and skill and that salvage services could not be "refused". In this case, there is no dispute of the material fact that the *In Rem* Defendant has nested undisturbed, on the bottom of the ocean for over half a century. The United States Navy had no hope or expectation of ever recovering the plane. The location of the *In Rem* Defendant was unknown and she was lost to a watery grave. Soon after it's loss, the Navy repeatedly marked the records as

---

**2.** Of course, there is no issue of *partial* abandonment in the case at bar, since it is agreed that the aircraft involved in this case is a single object. The foregoing discussion of abandonment by the United States Supreme Court in its unanimous opinion is, however, instructive.

"Stricken", indicating the Navy's abandonment of the TBD.

The Director of the Naval Historical Center and the Director and Assistant Director of the National Museum of Naval Aviation all confirm that the Intervenor United States has no funding to mount any timely effort to save the TBD, or even the ability of NMNA to trade government owned surplus aircraft in return for salvage services.

In *The # 105 Belcher Oil Company v. Griffin*, 97 F.2d 425, 426 (5 Cir.1938), the Court held that in order to be entitled to ownership under the "Law of Finds", a vessel must have been abandoned by its previous owner. The Court stated, "Dereliction or renunciation of property requires both the intent to abandon and an external action ... there must be a voluntary intention to abandon, or evidence from which such intention may be presumed."

In this case, there is no dispute that after the July 1943 loss of the aircraft, the only affirmative action taken by the Intervenor United States for the next half century was to mark the aircraft records as "Stricken". Approximately ten years ago, the location and a video tape of the abandoned and derelict aircraft was offered to the National Museum of Naval Aviation for the sum of Twenty-five Thousand Dollars. Thereafter, despite knowledge of the existence of this rare and historic TBD (the only known TBD in existence), the Intervenor United States, refused help to the abandoned and derelict aircraft that it now claims. The Intervenor's refusal was largely based on lack of congressional funding for salvage of historic ships and planes. Nevertheless, it is clear that the Intervenor has, for at least the last ten years, been unable or unwilling to rescue the TBD.

The Plaintiff/Salvor or its predecessors in interest, including Douglas Champlin, have performed voluntary salvage services so that the abandoned derelict aircraft can be salvaged, preserved and restored and displayed to the American public as the only surviving example of a rare and equally historic aircraft. There are three video tapes, a portion of the canopy and a radio mast that show success, in whole or in part, with regard to ongoing salvage for the purpose of having this Court protect the Plaintiff's valid federal salvage rights.

As set forth above, the issue of abandonment and ownership are secondary to the question of whether this Court can protect the Plaintiff's ongoing federal salvage rights as to the *In Rem* Defendant aircraft. Even were the Court to hold that the Intervenor United States was the owner (which it does not) the Plaintiff would continue to have an ongoing right to finish providing the salvage services which they have already started. The Plaintiff/Salvor has spent approximately $130,000.00 on salvage operations to date. This expense was incurred in locating and filming the wrecksite (for purposes of building the cradle and planning the final salvage expedition) and recovering a portion of the canopy and radio mast.

■ The Intervenor United States' legal argument relies, in part, upon *Protection Company v. The Charles P. Chouteau*, 5 F.Rep. 463, where aid tendered to a burning vessel was absolutely declined. By the late 1800's, however, the right of an owner or Captain to refuse salvage assistance to a vessel in maritime peril was relegated to instances where the vessel was not *then* in any maritime peril. The Intervenor United States has no adequate measures or funding by which rescue can be provided to the *In Rem* Defendant. Therefore, even if the Court were to hold that the United States owns the aircraft, refusal of salvage could not be allowed. The services of a voluntary salvor will be allowed ... "if a prudent man would have accepted" ... *Merritt and Chapman Derrick and Wrecking Co. v. United States*, 274 U.S. 611, 47 S.Ct. 663, 71 L.Ed. 1232 (1927). In *Tidewater Salvage v. Weyerhaeuser*, 633 F.2d 1304, 1306, 1307 (9 Cir.1980), the Court held that an owner could refuse

salvage if he was ... "acting as a prudent person ...". Numerous cases hold that an owner may not refuse salvage services if no other provision for rescue has been made and maritime peril exists. *Spreckels v. California*, 45 F. 647 (N.D.Cal.1890); *Manchester Brigade v. United States*, 276 F. 410 (E.D.Va.1921); *Hamburg– American Line v. United States*, 168 F.2d 47 (1 Cir.1948).

The legal argument of the Intervenor United States on abandonment of TBD–1 Buno # 0353 is based upon the assertion that such abandonment did not occur under the provisions of the Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 471 et. seq. That Act provides that the government *may* authorize the abandonment of property which has no commercial value or of which the estimated cost of continued care and handling would exceed proceeds of sale. The Intervenor argues that the statutory language allows, but does not mandate, abandonment of government property under certain conditions.

The Intervenor is correct in observing that the word "may" denotes a discretionary, not mandatory, act. However, whether the *In Rem* Defendant aircraft was abandoned as a discretionary act under the 1949 legislation is irrelevant with regard to the July 1st, 1943 crash and disposition of the *In Rem* Defendant. When Congress passed the Surplus Property Act of 1944, 50 U.S.C. § 1611, it used the non-discretionary *mandatory* word "shall" when directing the disposition of non-flyable, commercially unsalable aircraft. The only exception to the disposition of such aircraft was "unless other disposition is directed by the disposing agency". In 1944, the statutes and regulations relative to striking and disposition of government property were *mandatory*, not discretionary. Five (5) years later, when the Federal Property and Administrative Services of Act of 1949 was passed, the only non-flyable, non-sellable aircraft then in existence were those in which some other disposition had already been directed by the disposing agency, as in Admiral McCain's "Aviation Circular."

Because this case can be adjudicated without construing the 1949 discretionary "abandonment" language, the Court will leave that issue to another day and some other *In Rem* Defendant aircraft that may have been flyable and/or sellable in 1949.

## SALVAGE OF HISTORIC AIRCRAFT

█ In the case at bar, all the parties have assisted in documenting the historical information concerning the *In Rem* Defendant aircraft. It is obviously important to carry out the recovery of ancient shipwrecks and historic aircraft in such a way so as to protect the *In Rem* Defendant from additional damage due to the recovery operation itself.

In *Cobb Coin Company, Inc., v. The Unidentified, Wrecked and Abandoned Sailing Vessel*, 549 F.Supp. 540 (S.D.Fla. 1982),[3] this Court held that in order to state a claim for a salvage award on an ancient vessel of historical and archaeological significance, it was *essential* that the salvors document to the Admiralty Court's satisfaction that the historical and archaeological provenience of the *In Rem* Defendant was documented and preserved. The Court stated, "To leave this element merely for consideration of a salvage awarded would not provide, perforce, sufficient incentive to salvors to insure that the information is obtained. Accordingly, however, this Court holds that by meeting the threshold requirement, a salvor simultaneously 'enhances' the value of his recovery in such a way as will be explicitly recognized by the Court in the determination of the salvage award." *Id.* at 559.

In carrying out the Admiralty Court's responsibility to return to present day use, those objects abandoned, lost or in maritime peril, this Court now holds that in

---

**3.** Again, coincidentally an opinion authored by the undersigned Judge.

order to state a claim for a salvage award on a historic aircraft, it is an essential element that the salvors document to the Admiralty Court's satisfaction that they have made adequate provision, and have the funding necessary, to recover the aircraft in such a way as to minimize further damage to the *In Rem* Defendant because of the recovery operation. Further, the salvor must make adequate provisions for the stabilization and preservation of the remains of the historic aircraft after recovery.

## THE INTERVENOR UNITED STATES' FUTURE ROLE IN IN REM SALVAGE PROCEEDINGS INVOLVING HISTORIC AIRCRAFT

■ Nearly seventeen (17) years ago, in its *Cobb Coin* decision, this Court held that although the State of Florida did not own the artifacts being salvaged, the Court would recognize the State "as trustee for the people" for the purpose of exhibiting some of the salvaged property for the people's benefit. In *Cobb Coin,* 549 F.Supp. at 562, the Court allowed a state agency to intervene in future salvage award determinations, "to assert an interest on behalf of its citizenry to particular artifacts recovered which are not represented in its present inventory and which it feels are essential to the preservation of the people's heritage." As in *Cobb Coin,* this Court now holds that the Intervenor UNITED STATES may intervene and request that the *In Rem* Defendant aircraft TBD–1 Buno # 0353 be awarded to the National Museum of Naval Aviation in Pensacola, Florida. An historic warplane of this type is not represented in the Museum's present inventory. The Plaintiff/Salvor and Intervenor agree that recovery and display of this aircraft is essential to the preservation of the people's heritage.

In the event the Court awards the salvaged remains of this historic aircraft to the National Museum of Naval Aviation, as Trustee for the People of the United States, the Court will determine a proper salvage award based upon the labor expended, the promptitude, skill and energy displayed, the value of the property employed by the salvors, the danger to which the property was exposed, the risk incurred by the salvors in securing the property from the impending peril, the value of the property saved, and the degree of danger from which the property was rescued. See *Cobb Coin,* 525 F.Supp. at 207 and *Norris,* 3A "Benedict on Admiralty", The Law of Salvage, 7th Edition, Section 244.

Plaintiff International Aircraft Recovery, LLC is entitled to recover reasonable attorneys fees and the costs of these proceedings from the Intervenor United States. The attorney for the Plaintiff shall file Affidavits stating Plaintiff's requested fees and costs, including the number of hours worked, the billing rate applicable to each chargeable hour and the amount actually paid by the client. The Intervenor United States may respond by Affidavits within thirty days from service of Plaintiff's fee and cost Affidavit.

Accordingly, after a careful review of the record, the Court being otherwise fully advised in the premises, it is

**ORDERED and ADJUDGED** that Plaintiff's Motion for Summary Judgment be and the same is hereby **GRANTED.** The Intervenor's motion for summary judgment be, and the same is hereby, DENIED. Final Judgment be and the same is hereby, entered in favor of Plaintiff. The Court retains jurisdiction for the purpose of awarding title or a salvage award and enforcing other provisions of this Order.